## UNITED STATES v. EASON OIL CO.
### No. 1638.

District Court, W. D. Oklahoma.

Sept. 22, 1934.

William C. Lewis, U. S. Dist. Atty., and Wade H. Loofbourrow, Asst. U. S. Dist. Atty., both of Oklahoma City, Okl., Douglas Arant, Sp. Asst. to the Atty. Gen., and John F. Davis, Counsel for Petroleum Administrator, both of Washington, D. C., for the United States.

P. C. Simons, of Enid, Okl. (Simons, McKnight, Simons, Mitchell & McKnight, of Enid, Okl., on the brief), and F. A. Rittenhouse, of Oklahoma City, Okl., for defendant.

VAUGHT, District Judge.

The United States of America brings this action alleging that the defendant is the owner of certain leases in the Crescent oil field of Logan county, Okl.; that, under the National Industrial Recovery Act, the President

of the United States is authorized to prepare or have prepared a code of fair competition to effectuate the purposes of said act, and that, by virtue of and pursuant to section 3 (a), title 1 of the said Act (15 USCA § 703 (a), the President, by Executive Order No. 6256 dated August 19, 1933, approved a code of fair competition for the petroleum industry; that the Secretary of the Interior was duly designated by the President as Administrator of the Code of Fair Competition for the Petroleum Industry; that thereafter, on or about the 20th day of December, 1933, the Secretary approved and promulgated certain regulations governing the development of new pools as defined therein, and particularly promulgated regulations governing the Crescent Pool in Logan county, Okl., said regulations, among other provisions, containing the following:

"(2) Any and all wells hereafter drilled shall be located in accordance with a well spacing plan of one well in the center of each forty-acre tract, based upon legal subdivisions, except

"(3) Any lessee desirous of drilling at any location within a forty-acre tract other than the center of such tract, and who is able to present geologic and other data indicating that he is entitled to special consideration because his producing properties are at or near the edge of the pool, may submit such data to me, and may, if I so decide, be authorized to drill at such other location; but under no circumstances except those just described shall any well in any forty-acre tract be drilled at any location other than the center of such tract."

The bill further alleges that the defendant, Eason Oil Company, is now drilling a well on a 40-acre lease in said Crescent Pool at a point other than the center of said 40 acres, said lease being more particularly described as the southwest quarter of the southwest quarter, section 34, township 17 north, range 4 west, and that the drilling of said well is in violation of the regulations provided by the Administrator of the Petroleum Code, and in violation of the National Recovery Act.

The plaintiff seeks injunctive relief against the defendant, enjoining the defendant from drilling on the 10-acre tract in the northwest quarter of the southwest quarter of the southwest quarter of section 34, township 17 north, range 4 west, Logan county, Okl.; and from drilling in the northwest quarter of the northeast quarter of the southwest quarter of section 34, township 17 north, range 4 west, Logan county, Okl., until the Petroleum Administrator may act upon its petition for exceptions, and thereafter, if said petition for exceptions is denied; and further from drilling in the north half of the northeast quarter of the northeast quarter of section 4, township 16 north, range 4 west; and, further, from drilling wells elsewhere in the Crescent Pool except according to and in compliance with the plan of orderly development approved by the Petroleum Administrator, and/or, in the alternative, from shipping any petroleum which has been or may be produced from any well drilled in violation of the plan of orderly development for the Crescent Pool approved May 31, 1934, or the products thereof, and from selling or transferring the same for shipment; and that upon final hearing said preliminary injunction be made permanent.

The defendant has filed its response, alleging that the well in question was partially drilled prior to the adoption of the regulations promulgated by the Secretary of the Interior; that the well is being drilled in accordance with the regulations provided by the Corporation Commission of the State of Oklahoma; and that the entire plan as promulgated by the Administrator of the Petroleum Code is unfair, unjust, inequitable, and discriminates against the defendant, tends to oppress small enterprises and to permit monopolies by the major companies holding leases more favorably located on the proven area of the producing sand known as the Wilcox sand, and, if enforced, will deprive the defendant of a valuable property right without due process of law.

The defendant also alleges that the bill of complaint does not state facts sufficient to constitute a cause of action in favor of the plaintiff and against this defendant in order to entitle the plaintiff to the relief sought in this action.

The defendant has also filed its motion to dismiss, alleging that the bill of complaint is without equity; that it does not state facts sufficient to constitute a cause of action; that the Code of Fair Competition for the Petroleum Industry is unconstitutional, illegal, null, void, arbitrary, and discriminatory, and is in violation of the Constitution of the United States and the amendments thereto; that the Congress of the United States was without constitutional authority of law to enact the National Industrial Recovery Act and to delegate the powers therein referred to to the President of the United States and to authorize him to delegate the powers conferred upon him to other persons, organiza-

tions, or subordinate governmental agencies, or to provide rules and regulations of the Petroleum Industry, etc.; that the Secretary of the Interior, as Administrator of the Code of Fair Competition of the Petroleum Industry, was without authority of law to promulgate and enforce the regulations governing the development of new pools as defined therein; that such purported rules and regulations are unconstitutional, illegal, null, void, unjust, discriminatory, and in violation of the Constitution of the United States; that the drilling of an oil and gas well for the production of oil and gas therefrom is a private enterprise, and one over which the Congress of the United States is without jurisdiction to legislate, or to regulate or control the same, or to delegate power so to do either to the President of the United States or any of the other representatives or subordinate governmental agencies of the United States; and the defendant prays that the bill of complaint be dismissed.

The evidence as to the reasonableness of the regulations promulgated by the Petroleum Administrator was submitted in the form of affidavits, and the legal questions as to the jurisdiction of the court and the constitutionality of the Petroleum Code were submitted by oral argument and by written briefs.

The first question for determination is whether or not the regulations, as promulgated by the Administrator of the Petroleum Code, are in violation of the Constitution of the United States.

The plaintiff contends that the statutes and regulations involved are as follows:

First, the National Industrial Recovery Act (48 Stat. 195, 196, 200, §§ 1, 2 (b), 3 (a, b, c), 10 (a, b), 15 USCA §§ 701, 702 (b), 703 (a, b, c), 710 (a, b):

Section 701: "A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to elimi-

nate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources."

Section 702 (b): "The President may delegate any of his functions and powers under this chapter to such officers, agents, and employees as he may designate or appoint, and may establish an industrial planning and research agency to aid in carrying out his functions under this chapter."

Section 703 (a): "Upon the application to the President by one or more trade or industrial associations or groups, the President may approve a code or codes of fair competition for the trade or industry or subdivision thereof, represented by the applicant or applicants, if the President finds (1) that such associations or groups impose no inequitable restrictions on admission to membership therein and are truly representative of such trades or industries or subdivisions thereof, and (2) that such code or codes are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them, and will tend to effectuate the policy of this title: Provided, That such code or codes shall not permit monopolies or monopolistic practices: Provided further, That where such code or codes affect the services and welfare of persons engaged in other steps of the economic process, nothing in this section shall deprive such persons of the right to be heard prior to approval by the President of such code or codes. The President may, as a condition of his approval of any such code, impose such conditions (including requirements for the making of reports and the keeping of accounts) for the protection of consumers, competitors, employees, and others, and in furtherance of the public interest, and may provide such exceptions to and exemptions from the provisions of such code, as the President in his discretion deems necessary to effectuate the policy herein declared.

"(b) After the President shall have approved any such code, the provisions of such code shall be the standards of fair competition for such trade or industry or subdivision thereof. Any violation of such standards in any transaction in or affecting in-

terstate or foreign commerce shall be deemed an unfair method of competition in commerce within the meaning of chapter 2 of this title; but nothing in this chapter shall be construed to impair the powers of the Federal Trade Commission under such chapter 2.

"(c) The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition approved under this chapter; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

Section 710 (a): "The President is authorized to prescribe such rules and regulations as may be necessary to carry out the purposes of this chapter, and fees for licenses and for filing codes of fair competition and agreements, and any violation of any such rule or regulation shall be punishable by fine of not to exceed $500, or imprisonment for not to exceed six months, or both.

"(b) The President may from time to time cancel or modify any order, approval, license, rule, or regulation issued under this chapter; and each agreement, code of fair competition, or license approved, prescribed, or issued under this chapter shall contain an express provision to that effect."

It also contends that, pursuant to said National Recovery Act and the power vested thereby in the President of the United States, and by the President of the United States by executive order vested in the Secretary of the Interior, the Code of Fair Competition for the Petroleum Industry, otherwise known as Executive Order No. 6256, approved by the President on August 19, 1933, became the law of the land, and has the same effect as if said code had been enacted by Congress itself.

The first question therefore is, has the Congress of the United States the power under the Constitution to limit the defendant in this case to the drilling of one oil well in the center of each 40-acre lease which he may own on private land in the state of Oklahoma and to provide under what conditions a well may be drilled at any other point in the 40-acre tract? This involves the power of Congress to make such a law or to enact legislation which directs the President to authorize some one else to make such a law or regulation. It is elementary that Con-

gress and the federal government are limited to the specific powers delegated to Congress and to the government by the Constitution; and the only constitutional provision which would justify the enactment by Congress of the National Recovery Act is article 1, section 8, of the Constitution of the United States, the third clause of which section is as follows: "The Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

Prior to the adoption of the Constitution, the regulation of all commerce was within the power of the individual state or colony, and this clause was included in the Constitution in order that the commercial relations between the various states should be conducted in a uniform and just manner, and that all commerce between the United States and foreign nations and between the United States and the various Indian Tribes should be regulated exclusively by Congress. The only power then that Congress has, with reference to commerce strictly within the United States, is to regulate commerce among the several states, and with Indian Tribes.

The first case involving this clause of the Constitution, which came before the Supreme Court of the United States for determination, was Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23, in which Chief Justice Marshall defined commerce as "traffic and intercourse," and in the opinion stated that the language of this clause comprehends every species of commercial intercourse between the United States and foreign nations, and that the clause did not comprehend that commerce which is completely internal and carried on between man and man in a state or between different parts of the same state and which does not extend to or affect other states. The same doctrine was announced in Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678; Trade-Mark Cases, 100 U. S. 82, 96, 25 L. Ed. 550; and Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357. These cases are followed by a long line of cases, all of which define and limit the terms "commerce" and "interstate commerce."

Webster's New International Dictionary defines commerce as "business intercourse; especially, the exchange or buying and selling of commodities, and particularly, the exchange of merchandise on a large scale between persons or groups of persons in society." Also, as a secondary meaning: "Interchange of ideas, sentiments, etc., as between man and man; formerly, also, communication; channel of intercourse."

The literal definition as given by Webster is not inconsistent with the legal definition as laid down by the Supreme Court. The Constitution does not empower Congress to regulate "commerce," but "commerce among the several States" or "interstate commerce," and the distinction between "commerce" and "interstate commerce" has been defined and emphasized by the Supreme Court from the rendition of the opinion in Gibbons v. Ogden, supra, down to the present time.

In Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 477, 29 L. Ed. 715, the court distinguished between "intrastate" and "interstate commerce." Logs were cut in New Hampshire for final shipment to Maine. According to custom they remained in or near a river for a year or more (apparently for the purpose of seasoning). They were taxed while in that condition by the state of New Hampshire, and it was held that the tax was valid, as the property was not actually in interstate commerce. The test laid down was, When did they "commence their final movement for transportation from the state of their origin to that of their destination"? And the court said: "There must be a point of time when they cease to be governed exclusively by the domestic law, and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination. When the products of the farm or the forest are collected, and brought in from the surrounding country to a town or station serving as an entrepot for that particular region, whether on a river or a line of railroad, such products are not yet exports; nor are they in process of exportation; nor is exportation begun until they are committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state. Until then it is reasonable to regard them as not only within the state of their origin, but as a part of the general mass of property of that state, subject to its jurisdiction, and liable to taxation there, if not taxed by reason of their being intended for exportation, but taxed, without any discrimination, in the usual way and manner in which such property is taxed in the state."

In Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 10, 32 L. Ed. 346, the court in great detail again defines "commerce" and "interstate commerce," and said:

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. The legal definition of the term, as given by this court in County of Mobile v. Kimball, 102 U. S. 691, 702 [26 L. Ed. 238], is as follows: 'Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities.' If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that congress would be invested, to the exclusion of the states, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock-raising, domestic fisheries, mining,—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat-grower of the northwest, and the cotton-planter of the south, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in congress and denied to the states, it would follow as an inevitable result that the duty would devolve on congress to regulate all of these delicate, multiform, and vital interests,—interests which in their nature are, and must be, local in all the details of their successful management.

"It is not necessary to enlarge on, but only to suggest, the impracticability of such a scheme, when we regard the multitudinous affairs involved, and the almost infinite variety of their minute details. * * *

"The demands of such a supervision would require, not uniform legislation generally applicable throughout the United States, but a swarm of statutes only locally applicable, and utterly inconsistent. Any movement toward the establishment of rules of production in this vast country, with its many dif-

ferent climates and opportunities, could only be at the sacrifice of the peculiar advantages of a large part of the localities in it, if not of every one of them. On the other hand, any movement toward the local, detailed, and incongruous legislation required by such an interpretation would be about the widest possible departure from the declared object of the clause in question."

In McCall v. California, 136 U. S. 104, 10 S. Ct. 881, 882, 34 L. Ed. 392, the court, in defining "commerce," adopts the definition by Pomeroy in his work on Constitutional Law, as follows: "It includes the fact of intercourse and of traffic, and the subject-matter of intercourse and traffic. The fact of intercourse and traffic, again, embraces all the means, instruments, and places by and in which intercourse and traffic are carried on, and, further still, comprehends the act of carrying them on at these places, and by and with these means. The subject-matter of intercourse or traffic may be either things, goods, chattels, merchandise, or persons. All these may therefore be regulated."

In Delaware, Lackawanna & Western Railroad Co. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 904, 59 L. Ed. 1397, which action was brought by the plaintiff below for damages resulting from an injury received while mining coal, the court said: "The averments of the complaint as to the manner of the receiving of the injury by plaintiff showed conclusively that it did not occur in interstate commerce. The mere fact that the coal might be or was intended to be used in the conduct of interstate commerce after the same was mined and transported did not make the injury one received by the plaintiff while he was engaged in interstate commerce. The injury happening when plaintiff was preparing to mine the coal was not an injury happening in interstate commerce, and the defendant was not then carrying on interstate commerce,—facts essential to recovery under the Employers' Liability Act [45 USCA §§ 51–59]."

In Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 531, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, the constitutionality of an act of Congress prohibiting transportation in interstate commerce of goods, the manufacture of which employed certain kinds of child labor, was involved; and the court, holding that the regulation of the business of manufacturing was beyond the reach of Congress under the Commerce Clause, said:

"Commerce 'consists of intercourse and traffic * * * and includes the transportation of persons and property, as well as the purchase, sale and exchange of commodities.' The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped, or used in interstate commerce, make their production a part thereof. Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397.

"Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation.

"'When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state.' Mr. Justice Jackson in Re Greene (C. C.) 52 F. 104, 113. This principle has been recognized often in this court. Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. Ed. 615, and cases cited. If it were otherwise, all manufacture intended for interstate shipment would be brought under federal control to the practical exclusion of the authority of the states, a result certainly not contemplated by the framers of the Constitution when they vested in Congress the authority to regulate commerce among the states. Kidd v. Pearson, 128 U. S. 1, 21, 9 S. Ct. 6, 32 L. Ed. 346.

"It is further contended that the authority of Congress may be exerted to control interstate commerce in the shipment of child-made goods because of the effect of the circulation of such goods in other states where the evil of this class of labor has been recognized by local legislation, and the right to thus employ child labor has been more rigorously restrained than in the state of production. In other words, that the unfair competition, thus engendered, may be controlled by closing the channels of interstate commerce to manufacturers in those states where the local laws do not meet what Congress deems to be the more just standard of other states.

"There is no power vested in Congress to require the states to exercise their police power so as to prevent possible unfair competition. Many causes may co-operate to give one state, by reason of local laws or conditions, an economic advantage over others. The commerce clause was not intended to give

to Congress a general authority to equalize such conditions. In some of the states laws have been passed fixing minimum wages for women, in others the local law regulates the hours of labor of women in various employments. Business done in such states may be at an economic disadvantage when compared with states which have no such regulations; surely, this fact does not give Congress the power to deny transportation in interstate commerce to those who carry on business where the hours of labor and the rate of compensation for women have not been fixed by a standard in use in other states and approved by Congress."

In Crescent Cotton Oil Co. v. Mississippi, 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166, the court held that the ginning of cotton was not interstate commerce.

In Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 86, 67 L. Ed. 237, in a case arising in Pennsylvania in which the state sought to tax anthracite coal ready for shipment or market, the court held the tax a valid tax and not a burden on interstate commerce, and said:

"The reach and consequences of the contention repel its acceptance. If the possibility, or indeed certainty, of exportation of a product or article from a state determines it to be in interstate commerce before the commencement of its movement from the state, it would seem to follow that it is in such commerce from the instant of its growth or production, and in the case of coals, as they lie in the ground. The result would be curious. It would nationalize all industries, it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massachusetts and the woolen industries of other states at the very inception of their production or growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet 'on the hoof,' wool yet unshorn, and coal yet unmined because they are in varying percentages destined for and surely to be exported to states other than those of their production.

"However, we need not proceed further in speculation and argument. Ingenuity and imagination have been exercised heretofore upon a like contention. There is temptation to it in the relation of the states to the federal government, being yet superior to the states in instances or rather having spheres of action exclusive of them. The instances cannot in all cases be precisely defined. And the uncertainty attracts disputes, and is availed of to assert or suppose collisions which, in fact, do not exist. There is illustration in the cases. In Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715, the precise contention here made was passed upon and rejected. It involved the taxing power of a state, and the property subject to it (timber cut in its forests) was intended for exportation and had progressed nearer to exportation than the coal in the present case."

In Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 529, 67 L. Ed. 929, the court, in passing upon the constitutionality of a Minnesota statute imposing a tax on the business of mining iron ore, in which it was sought to evade the tax on the ground that the ore mined was to be used in interstate commerce, said:

"Plainly the facts do not support the contention. Mining is not interstate commerce, but, like manufacturing, is a local business, subject to local regulation and taxation. Kidd v. Pearson, 128 U. S. 1, 20, 9 S. Ct. 6, 32 L. Ed. 346; Capital City Dairy Co. v. Ohio, 183 U. S. 238, 245, 22 S. Ct. 120, 46 L. Ed. 171; Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, 238 U. S. 439, 444, 35 S. Ct. 902, 59 L. Ed. 1397; Hammer v. Dagenhart, 247 U. S. 251, 272, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 410, 42 S. Ct. 570, 66 L. Ed. 975 [27 A. L. R. 762]. Its character in this regard is intrinsic, is not affected by the intended use or disposal of the product, is not controlled by contractual engagements, and persists even though the business be conducted in close connection with interstate commerce. Cornell v. Coyne, 192 U. S. 418, 24 S. Ct. 383, 48 L. Ed. 504; Browning v. Waycross, 233 U. S. 16, 22, 34 S. Ct. 578, 58 L. Ed. 828; Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, supra; General Railway Signal Co. v. Virginia, 246 U. S. 500, 38 S. Ct. 360, 62 L. Ed. 854; Hammer v. Dagenhart, supra; Arkadelphia Milling Co. v. St. Louis Southwestern Ry. Co., 249 U. S. 134, 151, 39 S. Ct. 237, 63 L. Ed. 517; Crescent Cotton Oil Co. v. Mississippi, 257 U. S. 129, 136, 42 S. Ct. 42, 66 L. Ed. 166; Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237.

"The ore does not enter interstate commerce until after the mining is done, and the tax is imposed only in respect of the mining. No discrimination against interstate

commerce is involved. The tax may indirectly and incidentally affect such commerce, just as any taxation of railroad and telegraph lines does, but this is not a forbidden burden or interference."

In Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 S. Ct. 548, 552, 76 L. Ed. 1038, which involved the right of the state to tax electricity generated in the state which, without breaking the current, was transmitted to interstate lines for use in other states, the court sustained the state tax, holding that the generation of electricity was an intrastate transaction and not interstate commerce. It said:

"We are satisfied, upon a consideration of the whole case, that the process of generation is as essentially local as though electrical energy were a physical thing; and to that situation we must apply, as controlling, the general rule that commerce does not begin until manufacture is finished, and hence the commerce clause of the Constitution does not prevent the state from exercising exclusive control over the manufacture. Cornell v. Coyne, 192 U. S. 418, 428, 429, 24 S. Ct. 383, 48 L. Ed. 504. 'Commerce succeeds to manufacture, and is not a part of it.' United States v. E. C. Knight Co., 156 U. S. 1, 12, 15 S. Ct. 249, 253, 39 L. Ed. 325.

"Without regard to the apparent continuity of the movement, appellant, in effect, is engaged in two activities; not in one only. So far as it produces electrical energy in Idaho, its business is purely intrastate, subject to state taxation and control. In transmitting the product across the state line into Utah, appellant is engaged in interstate commerce, and state legislation in respect thereof is subject to the paramount authority of the commerce clause of the Federal Constitution. The situation does not differ in principle from that considered by this court in Oliver Iron Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929. There the state of Minnesota had imposed an occupation tax on the business of mining ores. The tax was assailed as being in conflict with the commerce clause. It appeared that substantially all the ores there in question were mined for delivery to consumers outside the state; and that the ores passed practically at once after extraction into the channels of interstate commerce. The greater part of the ores came from open pit mines, to which empty cars were run and there loaded; the ores being severed from their natural bed by means of steam shovels and lifted directly into the cars. When loaded, these cars were promptly returned to the railroad yards from which they came and were there put into trains and continued their interstate journey. The several steps followed in such succession that there was practical continuity of movement from the severance of the ores to the end of their journey in another state. Upon these facts the court held that the commerce clause was not infringed.

" 'The ore does not enter interstate commerce,' it was said, page 179 of 262 U. S., 43 S. Ct. 526, 529, 'until after the mining is done, and the tax is imposed only in respect of the mining. No discrimination against interstate commerce is involved. The tax may indirectly and incidentally affect such commerce, just as any taxation of railroad and telegraph lines does, but this is not a forbidden burden or interference.'

"In Hope Gas Co. v. Hall, 274 U. S. 284, 47 S. Ct. 639, 71 L. Ed. 1049, this court considered an act of the state of West Virginia imposing a tax upon the production, among other things, of natural gas. The chief business of the Hope Gas Company was the production and purchase of natural gas in West Virginia, and the continuous and uninterrupted transportation of it through pipe lines into adjoining states, where it was sold, delivered, and consumed. Most of it passed into interstate commerce by continuous movement from the wells where it originated. Interpreting and following the decision of the state court, it was held that the tax was to be computed upon the value of the gas at the well, and that if, thereafter, executive officers should fix values upon an improper basis appropriate relief would be afforded by the courts. The tax was sustained as not involving an infringement of the commerce clause of the Constitution."

In Chassaniol v. City of Greenwood, 291 U. S. 584, 54 S. Ct. 541, 542, 78 L. Ed. 1004, decided March 12, 1934, the Supreme Court, in an opinion by Mr. Justice Brandeis, reaffirmed the doctrine hereinbefore discussed. In that case the city of Greenwood, Miss., laid a tax on every person engaged in the business of buying or selling cotton for himself within the city. The plaintiff paid the tax under protest. He applied for refund. It was denied. The action of the city in denying the claim was sustained by both the circuit court and the Supreme Court of the state. The Supreme Court of the United States, on review of the state Supreme Court's decision (166 Miss. 848, 148 So. 781), held that the business was an intrastate transaction and was not interstate commerce, and said: "Ginning cotton, transporting it to Greenwood, and warehousing, buy-

ing, and compressing it there, are each, like the growing of it, steps in preparation for the sale and shipment in interstate or foreign commerce. But each step prior to the sale and shipment is a transaction local to Mississippi, a transaction in intrastate commerce. Hence those engaged in performing any such local function may be subjected to an occupation tax, just as the property used, or processed, by them may be subjected to a property tax."

In Champlin Refining Co. v. Corporation Commission of Okl., 286 U. S. 210, 52 S. Ct. 559, 565, 76 L. Ed. 1062, 86 A. L. R. 403, the court holds that production of oil is a mining operation and not a part of interstate commerce, and said: "Plaintiff contends that the act and proration orders operate to burden interstate commerce in crude oil and its products in violation of the commerce clause. * * * It is clear that the regulations prescribed and authorized by the act and the proration established by the commission apply only to production and not to sales or transportation of crude oil or its products. Such production is essentially a mining operation, and therefore is not a part of interstate commerce, even though the product obtained is intended to be and in fact is immediately shipped in such commerce. Oliver Iron Co. v. Lord, 262 U. S. 172, 178, 43 S. Ct. 526, 67 L. Ed. 929; Hope Gas Co. v. Hall, 274 U. S. 284, 288, 47 S. Ct. 639, 71 L. Ed. 1049; Foster-Fountain Packing Co. v. Haydel, 278 U. S. 1, 10, 49 S. Ct. 1, 73 L. Ed. 147; Utah Power & Light Co. v. Pfost, supra. No violation of the commerce clause is shown."

In Ryan v. Amazon Petroleum Corp., 71 F.(2d) 1, 4, Fifth Circuit Court of Appeals said: "Oil production is either mining or manufacture. Neither the one nor the other is ordinarily within the power of Congress to regulate within a state. Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; United Mine Workers v. Coronado Coal Co., 259 U. S. 345, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929; Champlin Refining Co. v. Corporation Commission, 286 U. S. 210, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403; Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 S. Ct. 548, 76 L. Ed. 1038."

The foregoing authorities have been referred to only for the purpose of showing that the dividing line between interstate and intrastate commerce has been clearly defined by our highest court and that the doctrine earlier announced is the doctrine today recognized.

If, therefore, the drilling of an oil well is not interstate commerce, certainly Congress has no power of control over such drilling; and, having none itself, it can of course confer none.

The laws of Oklahoma provide for the limiting of production of petroleum in the state to reasonable market demand and have also provided commissions to administer the law. The state of Oklahoma, therefore, has assumed jurisdiction to regulate the production of petroleum, and such production is now controlled by the machinery devised and set up by the state, which regulation by the state has been recognized by the Supreme Court as an exercise of a constitutional right. Champlin Refining Co. v. Corporation Commission, supra.

It is contended, however, by counsel for the government that, while the drilling of an oil well is not itself interstate commerce, nevertheless it so affects or burdens interstate commerce that its regulation comes clearly within the power of Congress under the commerce clause of the Constitution, and in support of this theory they cite the following cases: Swift & Co. v. U. S., 196 U. S. 375, 25 S. Ct. 276, 279, 49 L. Ed. 518; The Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Houston, E. & W. T. Ry. Co. v. U. S., 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; United States v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 447, 63 L. Ed. 936; Duplex Printing Press Co. v. Dist. No. 15, etc. (Deering) 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 402, 66 L. Ed. 735, 23 A. L. R. 229; Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 478, 67 L. Ed. 839; Coronado Coal Co. v. United Mine Workers, 268 U. S. 295, 45 S. Ct. 551, 556, 69 L. Ed. 963; United States v. Brims et al., 272 U. S. 549, 47 S. Ct. 169, 71 L. Ed. 403; Tagg Bros. & Moorhead et al. v. U. S., 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524. All these cases are easily distinguishable from the Utah Power & Light Co. Case, and involve a phase of intrastate commerce which directly affects interstate commerce.

In Swift & Co. v. U. S., supra, Swift & Co. was engaged in buying and slaughtering live stock in several states, selling the fresh meat to dealers in the several states, shipping

to them by railroads, shipping to its own agents in other states for sale, and it controlled a very large per cent. of the trade and commerce in the country. They had combined to freeze bidding, manipulate prices for cattle, and secure rebates from railroads, and had built up and intended to maintain a monopoly of the fresh meat business. The court said: "Although the combination alleged embraces restraint and monopoly of trade within a single state, its effect upon commerce among the states is not accidental, secondary, remote, or merely probable. * * * Therefore the case is not like United States v. E. C. Knight Co., 156 U. S. 1, 15 S. Ct. 249, 39 L. Ed. 325, where the subject-matter of the combination was manufacture, and the direct object monopoly of manufacture within a state. However likely monopoly of commerce among the states in the article manufactured was to follow from the agreement, it was not a necessary consequence nor a primary end. Here the subject-matter is sales, and the very point of the combination is to restrain and monopolize commerce among the states in respect to such sales." It is therefore evident that there existed here a combination with the intent to restrain and monopolize commerce among the states.

In The Minnesota Rate Cases, supra, the suits were brought by stockholders of the Northern Pacific Railway Company, the Great Northern Railway Company, and the Minneapolis & St. Louis Railroad Company, respectively, to restrain the enforcement of two orders of the Railroad and Warehouse Commission of the state of Minnesota and two acts of the Legislature prescribing maximum charges for transportation of freight and passengers, and to prevent the adoption or maintenance of these rates by the railroad companies. The rates related to traffic exclusively between points within the state. It was contended, however, that as applied to cities on the state's boundary, or to places within competitive districts crossed by the state line, the rates disturbed the relation previously existing between interstate and intrastate rates, and thus imposed a direct burden upon interstate commerce and created discriminations against localities in other states. The rates were also assailed as confiscatory. The rates were sustained as to the Northern Pacific and Great Northern companies, but, in the case of the Minneapolis & St. Louis Railroad Company, they were held to be confiscatory, in view of the particular fac's shown with respect to that road.

In Houston, E. & W. T. Ry. Co. v. U. S., supra, the court held, quoting from the syllabus:

"Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the State, that is entitled to prescribe the final and dominant rule; otherwise the Nation would not be supreme within the National field.

"While Congress does not possess authority to regulate the internal commerce of a State, as such, it does possess power to foster and protect interstate commerce, although in taking necessary measures so to do it may be necessary to control intrastate transactions of interstate carriers."

In United States v. Ferger, supra, there was involved a forged bill of lading, and it was held that bills of lading are a part of the instrumentality of commerce between the states. In other words, they were necessary elements in the shipment of merchandise from one state to another, and the court merely held that a forged bill of lading for an interstate shipment was an interference with interstate commerce. The court said: "As the power to regulate the instrumentality was coextensive with interstate commerce, so it must be, if the authority to regulate is not to be denied, that the right to exert such authority for the purpose of guarding against the injury which would result from the making and use of spurious imitations of the instrumentality must be equally extensive."

In Duplex Printing Press Co. v. Dist. No. 15, etc. (Deering), supra, the question involved was a conspiracy to restrain complainant's interstate trade and commerce in printing presses, contrary to the Sherman Anti-Trust Act (15 USCA §§ 1–7, 15 note). This question is not involved in this case.

On Stafford v. Wallace, supra, the government relies more strongly than on any other case. The question involved in that case is not involved in the case at bar. The plaintiffs were commission men and dealers at yards who contended that their business was purely intrastate. Under the act, the Secretary was empowered to make rules and regulations, fix minimum and maximum rates, and prescribe methods of keeping accounts. Mr. Chief Justice Taft, in rendering the opinion, said: "The stockyards are not a place of rest or final destination. Thousands of head of live stock arrive daily by carload and trainload lots, and must be promptly sold

and disposed of and moved out, to give place to the constantly flowing traffic that presses behind. The stockyards are but a throat through which the current flows, and the transactions which occur therein are only incident to this current from the West to the East, and from one state to another. Such transactions cannot be separated from the movement to which they contribute and necessarily take on its character. The commission men are essential in making the sales, without which the flow of the current would be obstructed, and this, whether they are made to packers or dealers. The dealers are essential to the sales to the stock farmers and feeders. The sales are not in this aspect merely local transactions. They create a local change of title, it is true, but they do not stop the flow; they merely change the private interests in the subject of the current, not interfering with, but, on the contrary, being indispensable to, its continuity. The origin of the live stock is in the West; its ultimate destination, known to, and intended by, all engaged in the business, is in the Middle West and East, either as meat products or stock for feeding and fattening. This is the definite and well-understood course of business. The stockyards and the sales are necessary factors in the middle of this current of commerce."

It is clearly shown, therefore, in this opinion that the Supreme Court did not regard the acts of the commission men as purely local but as part of the general movement of the cattle, and therefore directly connected with interstate commerce.

Chicago Board of Trade v. Olsen, supra, was a suit to enjoin enforcement of Grain Futures Act (7 USCA § 1 et seq.) requiring records of cash and future sales, prevention of dissemination of misleading prices, and regulating adoption of rule permitting co-operative associations of producers financially responsible to become members, and the court said:

"If a corner and the enhancement of prices produced by buying futures directly burden interstate commerce in the article whose price is enhanced, it would seem to follow that manipulations of futures which unduly depress prices of grain in interstate commerce and directly influence consignment in that commerce are equally direct. The question of price dominates trade between the states. Sales of an article which affect the country-wide price of the article directly affect the country-wide commerce in it. By reason and authority, therefore, in determining the validity of this act, we are prevented from questioning the conclusion of Congress that manipulation of the market for futures on the Chicago Board of Trade may, and from time to time does, directly burden and obstruct commerce between the states in grain, and that it recurs and is a constantly possible danger. For this reason, Congress has the power to provide the appropriate means adopted in this act by which this abuse may be restrained and avoided. * * *

"The Board of Trade conducts a business which is affected with a public interest and is, therefore, subject to reasonable regulation in the public interest. The Supreme Court of Illinois has so decided in respect to its publication of market quotations. New York & Chicago Grain Exchange v. Chicago Board of Trade, 127 Ill. 153, 19 N. E. 855, 2 L. R. A. 411, 11 Am. St. Rep. 107. In view of the actual interstate dealings in cash sales of grain on the exchange, and the effect of the conduct of the sales of futures upon interstate commerce, we find no difficulty under Munn v. Illinois, 94 U. S. 113, 133, 24 L. Ed. 77, and Stafford v. Wallace, supra, in concluding that the Chicago Board of Trade is engaged in a business affected with a public national interest and is subject to national regulation as such."

Coronado Coal Co. v. United Mine Workers, supra, was an action in which the United Mine Workers interfered with the operation of the plaintiff's coal mine, and when the case was first tried the court said, in 259 U. S. 344, 42 S. Ct. 570, 582: "Coal mining is not interstate commerce, and the power of Congress does not extend to its regulation as such."

When the case was reheard, however, additional evidence showed a conspiracy on the part of the mine workers to destroy the mine for the purpose of interfering with the shipment of coal in interstate commerce, and the court said: "The mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production is ordinarily an indirect and remote obstruction to that commerce. But when the intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act. United Mine Workers v. Coronado Co., 259 U. S. 344, 408, 409, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; United Leather Workers v. Herkert, 265 U. S. 457, 471, 44 S. Ct. 623, 68 L. Ed. 1104,

33 A. L. R. 566; Industrial Association **v.** United States, 268 U. S. 64, 45 S. Ct. 403, 69 L. Ed. 849. \* \* \* We think there was substantial evidence at the second trial in this case tending to show that the purpose of the destruction of the mines was to stop the production of nonunion coal and prevent its shipment to markets of other states than Arkansas, where it would by competition tend to reduce the price of the commodity and affect injuriously the maintenance of wages for union labor in competing mines, and that the direction by the District Judge to return a verdict for the defendants other than the International Union was erroneous."

The other cases mentioned by the government are of similar nature and character, but in each case there is a direct connection between the intrastate action and the flow of commerce.

I am not convinced, therefore, that under the authorities cited in support of this contention the production of oil or gas by the drilling of a well wholly within a state constitutes an interference with or a burden upon interstate commerce.

■ The next contention of the government is that petroleum is an irreplaceable natural resource essential to the national defense; and that, since Congress is given the power to declare war, raise and support an army, provide and maintain a navy, and make laws which will be necessary to carry into effect those powers, Congress has power to conserve natural resources. I shall not take time to enter into any particular discussion of this point because it is not necessary. If Congress is of the opinion that any resource in this nation is essential to the maintenance of this government and its proper defense, it has ample power under the Constitution to purchase oil lands and hold them for the benefit of the government. But, so long as the individual citizen is permitted to hold property, his rights in property are protected under the Constitution.

■ Another proposition, which perhaps is urged more strongly by the government than any other, is that we are in the midst of a great national depression, and the National Recovery Act is prefaced by the statement: "A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist." Section 1 (15 USCA § 701).

It is admitted that such an emergency exists, and, while there is a widespread difference of opinion as to its causes and the remedies which should be adopted for its elimination, yet it is also recognized that this is not the first emergency which has existed in this nation. During the one hundred and fifty years of our national existence we have had many emergencies, drouths, financial depressions; our nation has been rent asunder by civil war; the nation has faced every conceivable character of emergency which might affect national prosperity and even national integrity. But, notwithstanding these conditions, our nation has gone steadily forward in social, moral, educational, and cultural development. At the close of the Civil War, in the midst of the most unsettled and distressing conditions resulting from the war, at the suggestion that, because of existing conditions, a departure should be had from constitutional government, the Supreme Court of the United States, in an opinion by Mr. Justice Davis in 1866, Ex parte Milligan, 4 Wallace 2, 120, 18 L. Ed. 281, said: "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence." This is fundamental and announces the very basis for the growth and development of our nation—respect for, and obedience to, constitutional government.

■ It is admitted that the great economic depression of today is serious in its effects upon all classes of people, but I doubt if it is comparable to such an emergency as would exist if the checks and limitations provided in the Constitution were broken down or ignored. The Supreme Court has never at any time indicated that any crisis justifies setting aside or ignoring our fundamental law. In a recent case, Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 235, 78 L. Ed. 413, 88 A. L. R. 1481, the Supreme Court of the United States, in an opinion by the learned Chief Justice, said: "While emergency does not create power,

emergency may furnish the occasion for the exercise of power."

This merely states in another form what was said by the Supreme Court in Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 302, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, during the World War: "Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed."

In referring to the opinion in Wilson v. New, supra, Chief Justice Taft, in Wolff Packing Co. v. Industrial Court, 262 U. S. 522, 43 S. Ct. 630, 636, 67 L. Ed. 1103, 27 A. L. R. 1280, said: "It is not too much to say that the ruling in Wilson v. New went to the border line, although it concerned an interstate common carrier in the presence of a nation-wide emergency and the possibility of great disaster. Certainly there is nothing to justify extending the drastic regulation sustained in that exceptional case to the one before us."

It is not possible to state that great, fundamental, constitutional truth in stronger terms than those in which it has been stated by the Supreme Court in the cases just cited. Congress has no power in the midst of an emergency which it did not have before. Its power is definitely fixed by the Constitution.

It is the contention of the government that, in the Minnesota Mortgage Case just referred to (Home Building & Loan Ass'n v. Blaisdell, supra), and in Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, the Supreme Court justified the exercise of legislative power by Congress in controlling prices of commodities. There is no basis for this contention. The Supreme Court did not pass upon that question. The question was not even before the court. The question in the New York Milk Case was whether or not the state of New York exceeded its constitutional powers in fixing a minimum price at which milk could be retailed within the state. The question in the Minnesota case was whether or not the Legislature of Minnesota exceeded its constitutional powers in providing for the extension of the time in which mortgaged indebtedness could be paid during an emergency; and the court simply held that, under the powers reserved to the states under the Constitution of the United States, those states were within their constitutional powers in enacting those laws. But the fact that the state has power to fix intrastate prices or regulate intrastate business does not in any way justify

the conclusion that Congress has the same power, for the only power which Congress has to deal with commerce is to regulate commerce "among the several States."

Cooley in his Constitutional Limitations (8th Ed.) vol. 2, p. 1232, said: "In the American constitutional system, the power to establish the ordinary regulations of police has been left with the individual States, and it cannot be taken from them, either wholly or in part, and exercised under legislation of Congress. Neither can the national government through any of its departments or officers, assume any supervision of the police regulations of the States. All that the Federal authority can do is to see that the States do not, under cover of this power, invade the sphere of national sovereignty, obstruct or impede the exercise of any authority which the Constitution has confided to the nation, or deprive any citizen of rights guaranteed by the Federal Constitution."

The right to fix minimum prices for certain commodities has been recognized to exist in the states. This right may carry with it the curtailment of production; and in the National Recovery Act Congress recognized the right of the state to control the production of petroleum. Under section 709, title 15 USCA, the very act from which the sections 701, 702 (b), 703 (a, b, c), and 710 (a, b), title 15 USCA, supra, are taken, which is designated "Oil Regulation" and under subsection (c) thereof, it is provided: "The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State."

Pursuant thereto the President on July 11, 1933, promulgated Executive Order No. 6199 (15 USCA § 709 note), which provided: "The transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State, is hereby prohibited."

And on July 14, 1933, the President promulgated Order No. 6204 (15 USCA § 709 note), which authorized the Secretary of the

Interior to exercise all powers vested in the President for the purpose of enforcing paragraph (c) of section 709 of this Title and Executive Order No. 6199. Therefore, if, in dealing with the oil regulation, Congress merely empowered the President to prohibit the transportation in interstate commerce of what is commonly known as "hot oil," and if the President by his Executive Order above merely prohibited the transportation in interstate commerce of "hot oil," and if the President by his Executive Order No. 6204 merely empowered the Secretary of the Interior to carry out the authority vested in the President as above stated, the Secretary of the Interior had no authority except that vested in the President, and the act and the Executive Order both recognized the State's authority to regulate production and the power of Congress to prohibit the transportation in interstate commerce of the excess oil or "hot oil."

In Ryan v. Amazon Petroleum Corporation, supra, the court said: "Oil production is either mining or manufacture. Neither the one nor the other is ordinarily within the power of Congress. * * * It may be that under peculiar circumstances, such for example as are here shown to exist in the relation of oil production in Texas to commerce in oil with and among the other states, such a burden on or interference with interstate commerce may exist as to justify Congressional action, as in the case of intrastate rates which injuriously affect interstate commerce. * * * Such a question may arise under the provisions of the Petroleum Code, article III, section 4, relating to the fixing of production quotas, but in the provision of the act now before us there is no such question. The regulation of production is assumed to have been validly made by the state, and the federal regulation is actually only of interstate and foreign commerce, adjusted to aid and not to thwart the state action. Such co-operation between state and central government is not constitutionally wrong, but right and desirable. The central government was not created to be an opponent and a rival of the state governments, but to be a supplement and a protection to them. Its enumerated powers, although supreme and sometimes exercised to the dissatisfaction of some state, are not misused when by a happy concord of duty these governments can co-operate. The grant to the central government of the power to regulate interstate and foreign commerce is without qualification and in general exclusive of the states, and that government may rightly take up the regulation of a matter at the point where the state government because of this grant must itself cease to regulate."

It is clear that in the Amazon Case the court recognized the power of the state to regulate the production of oil, but it also recognized the power of the central government to control the transportation in interstate commerce of "hot oil." In the Amazon Case the court further said: "A producer of oil does not operate under any right or license derived from the federal government and is not subject to such rigorous treatment as if he did."

Judge Dawson of the Western District of Kentucky in Hart Coal Corporation et al. v. Sparks, U. S. Attorney, et al., 7 F. Supp. 16, in an opinion which for its thorough collation of authorities, logical reasoning, and legal conclusions is worthy of our highest court, has held directly against the contention of the government in this case, and this opinion by Judge Dawson is cited with approval by this court.

The Secretary of the Interior, in undertaking by his code to restrict this defendant in his production of oil and gas by providing that he may drill only one well on a 40-acre tract, and that the well must be in the exact center of the tract, has assumed an authority not even contemplated by Congress in the Recovery Act nor included within the authority delegated to the Secretary by the President.

I fully appreciate the fact that it is a delicate matter for a court to question the constitutionality of an act of an officer of the government, particularly at a time like this; but "the Constitution of the United States is a law for rulers and people," and there is no higher obligation resting upon an American citizen than the obligation to support and defend the Constitution. It is the fundamental law of our land. Its maintenance is necessary to the protection of our property rights and the preservation of our personal liberties. If the construction be placed on the Constitution which the government seeks to have placed on it in this case, all commerce is interstate commerce, and that which the Supreme Court has held not to be commerce will be interstate commerce, and every act of a citizen, regardless of its connection with interstate commerce, is subject to the control of the federal government. The fidelity with which the people in the early days of our nation's history fought to preserve the rights of the state, which rights have been protected with jealous care all

these years, will go for naught. If Congress can regulate and control the production of oil and gas wholly within the state, it can regulate and control any other private intrastate business, and the rights of the state heretofore recognized by the Constitution and by our highest court will be entirely destroyed. Executive orders will know no constitutional limitations. If this threatened impairment of the Constitution should continue and be held to be within the powers of Congress, there will be little resemblance between the weakened instrument and that which our fathers termed with pride our fundamental law. I am not unmindful there are many splendid provisions in the Code and that they might be productive of excellent results, but the performance of these functions in matters purely intrastate is not within the power of the federal government. Congress might be able to provide a better government for our states and municipalities than that now in force, but it is not within its power to do so. For it to attempt to do so is to usurp a power which it does not have. If the people of this nation desire to give Congress additional power, provision is made in the Constitution (article 5) for its amendment; but, until such amendment shall have been made in a constitutional manner, the duty of the courts to support and defend the Constitution as now written and as construed by our highest court is mandatory.

This court, therefore, is of the opinion that that portion of the Code which is involved in this case was not even authorized or contemplated by the act of Congress, and would be clearly unconstitutional if it had been, and is therefore merely an unauthorized order of the Secretary of the Interior.

The application for injunction will be denied, and the cause dismissed.