# Immigration Consequences of Undocumented Aliens' Arrival in United States Territorial Waters

Undocumented aliens interdicted within the twelve-mile zone that comprises the United States's territorial sea are not entitled to a hearing under the exclusion provisions of the Immigration and Nationality Act

The Immigration and Naturalization Service had the authority to promulgate an interpretative rule construing the "territorial waters" of the United States, as referred to in section 287 of the INA, to extend for twelve nautical miles

October 13, 1993

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum responds to requests made by the Office of the Associate Attorney General and the General Counsel's Office of the Immigration and Naturalization Service ("INS") for our views on the consequences under the Immigration and Nationality Act ("INA") of an undocumented alien's arrival in United States territorial waters. 8 U.S.C. §§ 1101-1537. Specifically, we have been asked whether undocumented aliens who have been interdicted within the United States's territorial waters are entitled to an exclusion hearing under section 236 of the INA,[1] 8 U.S.C. § 1226. We have also been asked to review the INS's enforcement authority under INA section 287, 8 U.S.C. § 1357, and to assess the INS's recent interpretive regulation, 8 C.F.R. § 287.1(a)(1) (1993), insofar as it purports to define the "external boundaries" of the United States under INA section 287.

We understand that resolution of these issues is of some urgency because the United States has been interdicting, within its territorial waters, vessels transporting large numbers of undocumented aliens seeking admission into the United States from various foreign countries. These activities have raised the question whether the United States must provide exclusion proceedings for such aliens. Agencies represented on the Working Group on Ocean Policy and the Law of the Sea, in particular the State Department and the United States Coast Guard, have expressed an interest in the issues. We have therefore invited, and received, the views of the State Department and the Coast Guard.

---

[1] *See* Memorandum for Office of Legal Counsel, Department of Justice, from Grover Joseph Rees III General Counsel, Immigration and Naturalization Service, *Re: Immigration Consequences of Arrival into the Territorial Waters of the United States* (June 15, 1993) Together with this cover memorandum, the INS has submitted a Memorandum for Maureen Walker, Bureau of Oceans and International Environmental and Scientific Affairs, Department of State, from the Office of the General Counsel, *Re: Information Request from Working Group on Ocean Policy and Law of the Sea* (Dec 17, 1992) ("INS/OGC Memorandum") and a draft memorandum of law ("INS Draft Memorandum").

## I. *Background*

The background to these requests is as follows. Historically, the United States adhered to the rule that the territorial sea extends three nautical miles out.[2] In 1988, however, President Reagan, by proclamation, extended the United States's territorial sea to a distance of twelve nautical miles. *See* Proclamation No. 5928, 3 C.F.R. 547 (1989), *reprinted in* 103 Stat. 2981 (1989), ("the Proclamation").[3] Although the Proclamation by its terms purported not to extend or otherwise alter existing Federal law or any jurisdiction, rights, legal interests, or obligations derived therefrom, questions arose concerning the possible or alleged effects of the Proclamation on domestic law or law enforcement.[4] Among these questions are the two considered in this opinion, relating to the procedural rights under the INA of undocumented aliens intercepted within twelve miles of the United States's shores, and to the authority of the INS to board and search sea vessels suspected of transporting undocumented aliens if such vessels are found within that twelve mile zone.

The INS's former General Counsel has taken the position that the Proclamation operated so as to extend the scope of the INA to the new twelve mile limit of the territorial waters. Specifically, the INS argues in the submissions considered here that an entitlement to an exclusion proceeding now arises whenever an undocumented alien arrives within the twelve mile limit. As the INS acknowledges, however, its past practice and views on this subject have not been consistent. In 1980, an INS memorandum to this Office concerning the treatment of Cuban refugees maintained that an alien apprehended within the territorial waters before landing "does not appear to have a right to apply for asylum" under the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ("Refugee Act"), and could be towed to a third country where he or she would not face persecution. *See* Memorandum for John Harmon, Assistant Attorney General, Office of Legal Counsel, from David Crosland, Acting Commissioner, INS, *Re: Cases on Illegal Entry to Cubans in Boats* at 1 (May 6, 1980) ("INS Cuba Memorandum"). However, a different INS position is reflected in a 1986 memorandum concerning procedures to be followed under Executive Order No. 12324, 46 Fed. Reg. 48,109 (1981), which provided for the return of Haitians interdicted on the high seas, with the exception of refugees. *See* Memorandum for Alan C. Nelson, Commissioner, INS, from Maurice C.

---

[2] *See Argentine Republic v. Amerada Hess Shipping Corp*, 488 U S 428, 441 n.8 (1989), *Cunard S.S. Co. v Mellon*, 262 U.S. 100, 122 (1923), *United States v. Postal*, 589 F.2d 862, 869 (5th Cir ), *cert denied*, 444 U S 832 (1979). The "territorial" or "marginal" sea is the belt of water immediately adjacent to a nation's coast. *See Restatement (Third) of the Foreign Relations Law of the United States*, § 511(a) (1986).

[3] On the Proclamation, *see Argentine Republic*, 488 U.S. at 441 n 8, John E. Noyes, *United States of America Presidential Proclamation No. 5928: A 12-Mile U.S. Territorial Sea*, 4 Int'l J. Estuarine and Coastal L. 142 (1989); Comment, *The Extension of the United States Territorial Sea Reasons and Effects*, 4 Conn. J Int'l L. 697 (1989).

[4] *See generally Hearing Before the Subcomm on Oceanography and Great Lakes of the House Comm. on Merchant Marine and Fisheries*, 101st Cong. 49, 60 (1989) ("1989 Hearings")

Inman, Jr., General Counsel, INS, *Re: Interdiction of Aliens* (Feb. 21, 1986) ("INS Haiti Memorandum"). Executive Order No. 12324 stated that its provisions for the interdiction-and-return of Haitians "are authorized to be undertaken only outside the territorial waters of the United States." 46 Fed. Reg. at 48,109. Following the terms of that Executive Order, the INS memorandum stated that "[i]ndividuals interdicted within the territorial waters of the United States are transported to a port of the United States for an adjudication of their immigration status pursuant to the Immigration and Nationality Act." INS Haiti Memorandum at 3. The memorandum further asserted that "it is rather well settled that individuals within our territorial waters may not be forcibly removed to the high seas." *Id.* at 4.[5] Thus, the INS's current position is at variance with its views as of 1980 — though not with its views as of 1986 — as well as being inconsistent with the position of the State Department and the Coast Guard.[6]

We conclude in Part II below that an undocumented alien who is intercepted within the twelve mile zone now comprising the United States's territorial waters is not entitled to an exclusion hearing under the INA. We base this conclusion primarily on an examination of the text of the statute — most importantly, its explicit requirements for exclusion proceedings. *See* INA sections 235, 236, 8 U.S.C. §§ 1225, 1226. We also examine the statute's provisions for asylum and withholding of deportation, and conclude that these provisions are consistent with, and indeed support, our reading of the statutory sections regarding exclusion. *See* Refugee Act, §§ 201(b), 202(e), 94 Stat. at 105, 107 (codified as amended at 8 U.S.C. §§ 1158, 1253). We then consider the INA's definition of the term "United States," INA section 101(a)(38), 8 U.S.C. § 1101(a)(38), and reject INS's contention that this definition, coupled with the Proclamation, compels the conclusion that the INA's procedural protections must apply to undocumented aliens who have entered the twelve mile zone. We also consider, and reject, INS's alternative claim that the jurisdictional section of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333, ("OCSLA") operates to extend the INA — and in particular the right to an exclusion hearing — to the limit of the territorial waters. Finally, we scrutinize the Proclamation itself, and conclude that it has no effect on the procedural entitlement that the INA provides to undocumented aliens.

---

[5] No authority was cited for this proposition

[6] In a letter responding to this Office's invitation to submit views on this issue, the State Department stated, "[a]t a minimum, it appears that the conduct of INS exclusion and deportation procedures by their very nature are only relevant once an alien has reached the land territory of the United States." Letter for Robert Delahunty, Acting Deputy Assistant Attorney General, Office of Legal Counsel, from Maureen Walker, Chief, Division of Marine Law & Policy, Bureau of Oceans and International Environmental and Scientific Affairs, Department of State at 2 (July 28, 1993) ("State Department Submission"). The State Department's views are discussed further, *infra,* p 87 n.23. In a similar submission, the Coast Guard took the position that undocumented aliens interdicted within the three mile zone encompassed by the pre-1988 territorial waters would be entitled to exclusion proceedings, but that those interdicted in the waters beyond that zone would not be entitled to such proceedings. Letter for Robert Delahunty, Acting Deputy Assistant Attorney General, Office of Legal Counsel, from David Kantor, Chief, Maritime and International Law Division, United States Coast Guard at 1 (Aug. 10, 1993).

In Part III below, we review the INS interpretative regulation, 8 C.F.R. § 287 (1993), that purports to construe the meaning of the "external boundaries" of the United States, as that term is used in INA section 287, 8 U.S.C. § 1357. The latter statute sets forth various investigative and enforcement powers of the INS. Of particular relevance, it empowers the INS to conduct certain warrantless searches within "a reasonable distance from any external boundary of the United States." INA section 287(a)(3), 8 U.S.C. § 1357(a)(3). We conclude that the INS had the authority to construe that section in a manner that reflected the enlargement of the United States's territorial waters under the Proclamation, and we offer two theories to justify that result. We also note an ambiguity in the INS's regulation, and recommend that, if INS decides to maintain its interpretation of INA section 287, it cure this defect.

## II.

### A. *Exclusion Proceedings Under The INA*

"It is undoubtedly within the power of the Federal Government to exclude aliens from the country." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973); *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Kleindienst v. Mandel*, 408 U.S. 753, 765-66 (1972); 1 Charles Gordon and Stanley Mailman, *Immigration Law and Procedure*, § 1.03[2][a] (rev. ed. 1993) ("Gordon & Mailman").

The means by which the Federal Government may prevent aliens from coming into the country are varied. Some aliens seeking to enter the United States must first be accorded the procedural rights provided by the INA, including an evidentiary hearing, before any determination to exclude them from this country can be made. Other aliens may, however, be prevented from entering the United States by Executive actions that do not implicate any INA procedures. Thus, in its recent decision in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 187 (1993), the Supreme Court held that neither the INA nor the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577 ("the Protocol"), placed any limit "on the President's authority to repatriate aliens interdicted beyond the territorial seas of the United States."[7] The question presented here is whether undocumented aliens seeking to enter the United States but interdicted *within* its territorial waters — that is, within twelve nautical miles from the United States' baselines — must be accorded an exclusion proceeding under the INA.

---

[7] The Court also noted that a provision of the INA, 8 U S C § 1182(f), "grants the President ample power to establish a naval blockade that would simply deny illegal . . . migrants the ability to disembark on our shores " *Sale*, 509 U.S. at 187.

Section 235(b) of the INA, 8 U.S.C. § 1225(b), "provide[s] the jurisdictional basis for an exclusion hearing before an immigration judge." *Matter of Waldei*, 19 I. & N. Dec. 189, 191 (1984). That section reads in part as follows:

> Every alien (other than an alien crewman) and except as otherwise provided in subsection (c) of this section and in section 1323(d) of this title,[8] who may not appear to the examining immigration officer *at the port of arrival* to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer.

8 U.S.C. § 1225(a) (emphasis added).

Section 236(a), 8 U.S.C. § 1226(a), provides for exclusion hearings before a "special inquiry officer" (i.e., an immigration judge, *see* 8 U.S.C. § 1101(b)(4)). Section 236(a) states:

> A special inquiry officer shall conduct proceedings under this section, administer oaths, present and receive evidence, and interrogate, examine, and cross-examine the alien or witnesses. He shall have authority in any case to determine whether an arriving alien who has been detained for further inquiry under section 1225 of this title shall be allowed to enter or shall be excluded and deported.

As the plain language of the INA makes clear, it is a predicate for conducting exclusion proceedings that the alien seeking admission be examined "*at the port of arrival*" by an immigration officer. 8 U.S.C. § 1225(b); *see also id.* § 1225(a) ("All aliens arriving *at ports of the United States* shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe.")' (emphasis added); 8 C.F.R. § 235.1 (1993) ("Application to enter the United States shall be made . . . in person to an immigration officer *at a U.S. port of entry enumerated in part 100 of this chapter*.) (emphasis added); *id.* § 100.4 (c)(2) (designating ports of entry); 1 Gordon & Mailman, at § 8.05[2][b] ("There are many places designated as ports of entry along the land borders of the United States and at international airports and seaports. It is to such a place, and at a time open for inspection, that an alien seeking entry to the United States must make his or her application for admission. . . . 'Instream' inspections are conducted aboard arriving ships.").[9] An alien inter-

---

[8] 8 U S C § 1225(c) refers to the temporary exclusion by summary procedures of certain aliens who appear to be excludable on national security or related grounds 8 U S.C. § 1323(d) refers to aliens who arrive as stowaways, and renders them subject to exclusion without a hearing *See Matter of Waldei,* 19 I & N. Dec at 192

[9] Mere arrival at a port of the United States, without more, does not entitle an alien to an exclusion hearing before a special inquiry officer under INA section 236 Rather, that section limits the special inquiry

dicted at sea — even if within the territorial waters of the United States — is not at any "port."[10] Consequently, there is no jurisdiction to conduct an exclusion proceeding in such a case.[11]

This construction of INA sections 235(b) and 236(a) comports with the text and structure of the INA. Both sections are located within Part IV, "Provisions Relating To Entry And Exclusion," of Subchapter II, "Immigration," of the INA. An analysis of these provisions confirms that statutory arrangements for exclusion proceedings presuppose that the alien is no longer at sea, but has reached port. The first provision of Part IV relates to the duties of persons transporting alien and citizen passengers to provide immigration officers with lists or "manifests" of the persons they are transporting. The duty to provide such a list attaches under INA section 231(a), 8 U.S.C. § 1221(a), "[u]pon the arrival of any person by water or by air *at any port* within the United States from any place outside the United States" (emphasis added); *see also* 8 C.F.R. § 231.1(a) (1993). Under INA section 232, 8 U.S.C. § 1222, aliens "arriving *at ports* of the United States" may be detained for observation and examination by immigration officers and medical officers if it is thought that they may be excludable for medical reasons (emphasis added). Before its repeal in 1986, the next section, INA section 233, 8 U.S.C. § 1223, authorized immigration officers to order the temporary removal of aliens "[u]pon the[ir] arrival *at a port* of the United States, . . . but such temporary removal shall not be considered a landing" (emphasis added). Section 234, 8 U.S.C. § 1224, deals with physical and mental examinations of certain arriving aliens, and provides for appeals therefrom. Sections 235 and 236, as discussed above, concern other inspections of arriving aliens and the institution of exclusion proceed-

---

officers' authority to conduct exclusion proceedings to cases in which aliens have reached port and have been detained or taken into custody by immigration officers.

[10] *Black's Law Dictionary* (6th ed 1990) defines a "port" as:

A place for the loading and unloading of the cargoes of vessels, and the collection of duties or customs upon imports or exports A place, on the seacoast, great lakes, or on a river, where ships stop for the purpose of loading and unloading cargo, or for the purpose of taking on or letting off passengers, from whence they depart, and where they finish their voyage. A port is a place intended for loading or unloading goods; hence includes the natural shelter surrounding water, as also sheltered water produced by artificial jetties, etc. The Baldhill, C C A N Y , 42 F 2d 123, 125.

*Id.* at 1161.

A "port" must thus be a "place" and, as Chief Justice John Marshall wrote, "[t]he objects with which the word '*place*' is associated, are all, in their nature, fixed and territorial." *United States v. Bevans*, 16 U S. (3 Wheat.) 336, 390 (1818) (emphasis added) (United States warship lying at anchor in Boston Harbor not a "place" within meaning of 1790 statute), *see also id.* at 340 (argument of Daniel Webster, citing common law meaning of "port"); *Devato v. 823 Barrels of Plumbago*, 20 F 510, 515 (S D N Y 1884).

Being at a port does not require that a "landing" be made A "landing" occurs when a vessel is left and the shore is reached. *Taylor v United States*, 207 U.S. 120, 125 (1907). We note that an alien who has arrived at a port but who has not landed may be entitled to an exclusion proceeding *See Matter of Pierre*, 14 I & N. Dec 467, 469-70 (1973).

[11] Even if it is assumed that an alien s presence at a "port" is not a *jurisdictional* requirement of an exclusion proceeding, the statute nonetheless makes clear that the *right* to such a proceeding does not attach unless the alien is at a "port"

ings. Section 237, 8 U.S.C. § 1227, provides for the immediate deportation of excluded aliens.

Judicial support for our interpretation is provided by *Haitian Refugee Center, Inc. v. Gracey*, 600 F. Supp. 1396 (D.D.C. 1985), *aff'd on other grounds*, 809 F.2d 794 (D.C. Cir. 1987), a suit challenging the Government's interdiction of visaless aliens on the high seas. There the district court stated:

> The Immigration and Nationality Act has established procedures for the exclusion of aliens, including the entitlement to a hearing. *See* 8 U.S.C. § 1226. Those rights, however, are reserved for aliens arriving "by water or by air at any port within the United States from any place outside the United States." *Id.* Contrary to plaintiffs' assertion, the interdicted Haitians also have no statutory "right to counsel", which is reserved to those aliens in "exclusion or deportation proceedings." 8 U.S.C. § 1362. Again, because those "exclusion or deportation proceedings" are restricted to aliens arriving "at any port within the United States," 8 U.S.C. § 1221, it is clear that the interdicted Haitians are entitled to none of these statutorily-created procedural rights, including the right to counsel.

*Id.* at 1404.

In sum, then, the overall statutory scheme regulating the exclusion of an alien is activated by the alien's arrival *at a port* of the United States. That event triggers significant legal effects, including the transporter's duty to provide a manifest, the immigration officers' powers to inspect and detain, and the alien's right, if detained, to an exclusion proceeding. Nothing in the statute contemplates that the same effects are to follow if the alien is interdicted at sea before reaching port — even if interdiction occurs within United States territorial waters. For purposes of exclusion under the INA, the ports of the United States — not the limits of its territorial waters — are functionally its borders. Accordingly, we conclude that aliens interdicted within United States territorial waters do not have a right to exclusion proceedings under INA section 236.

## B. *Asylum and Withholding Provisions of the INA*

Examination of the INA's basic distinction between exclusion and deportation proceedings, and of its provisions for asylum and withholding of deportation or return, confirms the conclusion reached in the previous section.

"'[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the

former category who are merely "on the threshold of initial entry."'" *Sale*, 509 U.S. at 175 (quoting *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958)) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)). The distinction in the rights and privileges accorded to these two groups is reflected in the different procedures applied to each. "The deportation hearing is the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission." *Landon v. Plasencia*, 459 U.S. at 25.

The differences between exclusion and deportation, and the varying procedural protections attached to each, turn on whether the alien has made an "entry" into the United States. "Entry" is here a term of art.[12] *See id.* at 28-29; *Matter of Patel*, 20 I. & N. Dec. 368, 370 (1991). "Physically coming into the United States does not necessarily accomplish an entry, else all inspections would effectively have to be made on foreign soil. Presence after inspection and admission, without further restraint, however, does amount to entry. So does penetrating the functional border by intentionally evading inspection before being apprehended." 1 Gordon & Mailman, at § 1.03[2][b]. Aliens who have made an "entry" are entitled to deportation proceedings; those who are seeking admission but who have *not* entered are accorded, at most, an exclusion proceeding — "a process in which the alien usually has less protection under the statute and little, if any, under the Constitution." *Id.*[13]

Before 1980, aliens who were excludable but not deportable did not have the right to apply for either asylum or withholding of deportation or return.[14] By the enactment of the Refugee Act, § 203(e), 94 Stat. at 107, Congress extended those benefits to both types of aliens.[15] Section 201(b) of the Refugee Act, as amended, now codified at 8 U.S.C. § 1158(a), prescribed that the Attorney General was to establish procedures for asylum applications. The Refugee Act's asylum provision states in part: "The Attorney General shall establish a procedure for an alien *physically present in the United States or at a land border or port of entry*, irrespective of such alien's status, to apply for asylum." 8 U.S.C. § 1158(a) (emphasis added). As explained immediately below, aliens interdicted within United States territorial waters are neither "at a land border or port of entry," nor even "physically present in the United States" within the meaning of the asylum statute.

---

[12] The term "entry" is defined in the INA to "mean[] any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise" 8 U S C. § 1101(a)(13)

[13] For an explanation of the different entitlements under each procedure, *see Landon v Plasencia*, 459 U S. at 25-28.

[14] *See Leng Ma May v. Barber; Maldonado-Sandoval v. INS*, 518 F 2d 278, 280 n 3 (9th Cir 1975); *United States ex rel. Tom We Shung v. Murff*, 176 F. Supp. 253, 260 (S.D.N.Y. 1959), *aff'd sub nom United States ex. rel. Tom We Shung v. Esperdy*, 274 F.2d 667 (2d Cir 1960); *Matter of Cenatice*, 16 I. & N Dec 162, 164-65 (1977).

[15] *See Sale*, 509 U.S at 176 n 33 (withholding); *id.* at 159-60 (asylum and withholding); *Haitian Refugee Center v. Gracey*, 809 F.2d at 841 (Edwards, J., concurring in part and dissenting in part), 8 C F.R. § 208 2(a) (1993); *Matter of Salim*, 18 I & N. Dec. 311, 314 (1982); 2 Gordon & Mailman, at § 33.05[2][a]-[b].

*See Sale*, 509 U.S. at 160 (INA's protections apply "only to aliens who *reside in* or *have arrived at the border of* the United States") (emphasis added).

In *Haitian Refugee Center, Inc. v. Baker*, 953 F.2d 1498 (11th Cir.), *cert. denied*, 502 U.S. 1122 (1992), the court construed the language of the asylum provision and held:

> [T]he plaintiffs in this case — who have been interdicted on the high seas — cannot assert a claim based on the INA or the Refugee Act. . . . The plain language of the statute is unambiguous and limits the application of the provision to aliens within the United States or at United States' borders or ports of entry. The plaintiffs in this case have been interdicted on the high seas and have not yet reached "a land border" or a "port of entry."

*Id.* at 1510 (citations omitted).

Precisely the same can be said of aliens who have been interdicted within territorial waters: they have not yet reached a land border or a port of entry.[16]

Furthermore, aliens interdicted within the territorial waters are also not "physically present in the United States," 8 U.S.C. § 1158(a), in the sense of that expression evidently intended by Congress. The statute's distinction between aliens "physically present in the United States" and aliens "at a land border or port of entry" is evidently designed to refer to the difference between *deportable* and *excludable* aliens: as pointed out above, the former are understood to be "already physically in the United States," while the latter are deemed to be "outside the United States seeking admission." *Landon v. Plasencia*, 459 U.S. at 25. Aliens interdicted within the territorial waters are undoubtedly not entitled to deportation proceedings. They are therefore not "physically present in the United States" within the meaning of the Refugee Act's asylum provision.

The Refugee Act also amended the INA to allow aliens in exclusion proceedings to seek "withholding" under INA section 243(h), 8 U.S.C. § 1253(h). *See Sale*, 509 U.S. at 175-76 ("The 1980 amendment erased the long-maintained distinction between deportable and excludable aliens for purposes of section 243(h). By adding the word 'return' and removing the words 'within the United States' from § 243(h), Congress extended the statute's protection to both types of aliens.").[17] In *Sale*, the Supreme Court held that this amendment did not limit the

---

[16] We note that, in its 1980 memorandum concerning the treatment of Cuban refugees, INS itself agreed that "an alien apprehended within territorial waters before landing does not appear to have a right to apply for asylum under the Immigration and Nationality Act " INS Cuba Memorandum at 1

[17] Withholding and asylum differ in significant ways, not the least of which is that asylum is discretionary relief which the Attorney General may or may not bestow upon qualified applicants, whereas withholding is mandatory as to those who qualify for it *See, e g , Sale*, 509 U S at 162 n 11, *INS v Cardoza-Fonseca*,

President's power to order the Coast Guard to repatriate undocumented aliens interdicted on the high seas. *Id.* at 174-77. In our view, the amendment also does not limit the President's power to order the Coast Guard to turn back undocumented aliens interdicted within United States territorial waters.

INA section 243(h), 8 U.S.C. § 1253(h), provides that:

> The Attorney General shall not deport or return[18] any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

Section 243(h) by its terms applies only to the actions of the *Attorney General. See Sale,* 509 U.S. at 177 (Attorney General is "the government official at whom [section 243(h)] is directed"). Nothing in the language of the provision speaks to the responsibilities of the Coast Guard or of any other agency that may encounter undocumented aliens, whether in the territorial waters or elsewhere. Moreover, the INA confers authority on executive branch officers other than the Attorney General, specifically including the President. *See, e.g.,* 8 U.S.C. § 1182(f) (authorizing the President by proclamation to suspend the entry of "any class of aliens" or to "impose on the entry of aliens any restrictions he may deem to be appropriate"); *see also Sale,* 509 U.S. at 171-72. If the President orders the Coast Guard to interdict and turn back aliens within the territorial waters, nothing in section 243(h) precludes that agency from obeying his instructions, any more than the section precluded the agency from obeying a similar Presidential order with regard to aliens on the high seas. *Cf. id.* at 172.[19]

---

480 U S. 421 (1987); *INS v. Stevic,* 467 U S 407, 421 n.15, 423 n 18, 426 (1984) Relatedly, the alien's proof burden is more readily discharged in asylum cases. *See* 2 Gordon & Mailman, at § 33.05[3].

[18] As explained above, without having made an "entry" into the United States, an alien would not be subject to deportation; necessarily, therefore, he or she would not be eligible for withholding of deportation An alien who has not made an "entry" but is in exclusion proceedings can, however, apply for the relief of withholding of "return " As the Supreme Court explained in *Sale,* the amendments made by the Refugee Act added the word "return" to section 243(h) to ensure that a form of relief analogous to withholding of deportation would be available in exclusion proceedings *See Sale,* 509 U S. at 174 ("We can reasonably conclude that Congress used the two words 'deport' and 'return' only to make § 243(h)'s protection available in both deportation and exclusion proceedings ")

[19] Furthermore, it would be incongruous if the INA provided that an alien seeking admission had the right to a hearing on a withholding claim, but not on an asylum claim, if he or she were intercepted in the territorial waters The two forms of relief are broadly similar in substance, and petitions for both are alike founded on the fear of persecution. Applicants frequently plead (and are invited by immigration officers and judges to plead) for both types of relief together indeed, under Board of Immigration Appeals rules, an asylum application presented initially to an immigration judge in an exclusion proceeding, or renewed in such a proceeding following denial by an INS officer, is also deemed an application for withholding *See Matter of Gharadaghi,* 19 I & N. Dec 311, 316 (1985); 8 C.F.R. § 208.3(b) (1993); *see also id* § 208 5(a) (INS shall make available application forms for asylum and withholding to requesting aliens in its custody); *id.* § 208.16(a) (if Asylum Officer denies asylum application, he or she shall also decide whether alien is entitled to withholding); *id* § 236.3(a)(1)-(2) (immigration judge is to advise an alien expressing fear of

This analysis of the scope of section 243(h) is consistent with Congress's understanding of the scope of Article 33 of the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6223, 6259, 189 U.N.T.S. 150 ("United Nations Convention"). As the Supreme Court has noted on several occasions, *see Sale*, 509 U.S. at 177-78; *INS v. Stevic*, 467 U.S. at 421, the main intent of the Refugee Act's changes in section 243(h) was to clarify the language of the provision so that it conformed to Article 33. The legislative history of the Refugee Act discloses that Congress construed the United Nations Convention to "insure fair and humane treatment for refugees *within the territory of the contracting states.*" H.R. Rep. No. 96-608, at 17 (1979) (emphasis added). While this legislative reference to "refugees within the territory" of a contracting State could conceivably include aliens within the marginal waters over which the State claimed sovereignty,[20] we think it accords better with the realities of immigration practice (particularly the difficulties of patrolling a border in the sea) to understand Congress to be referring only to aliens who have reached port or who have landed.[21]

Furthermore, Article 33 does not convey any entitlements that could be relevant here but that are not provided by section 243(h) itself. *See Stevic*, 467 U.S. at 428-30 n.22; *Haitian Refugee Center v. Gracey*, 809 F.2d at 841 (Edwards, J., concurring in part and dissenting in part). Thus, Article 33 does not serve as an independent basis for requiring procedural protections not conferred by the statute.[22] In addition, the State Department has advised us of its view that the United States's international law obligations under the Protocol do not require it to provide exclusion hearings to aliens who have merely arrived in its territorial waters.[23] That conclusion concerning the territorial scope of the signatories' obligations under

persecution that he or she may apply for asylum or withholding and shall make appropriate forms available). There is no apparent reason, therefore, why the statutory requirement that an applicant be at a port or a land border in order to seek asylum in an exclusion proceeding should not also govern applicants seeking withholding

[20] The word "territory" can in some contexts be understood to include the territorial sea *See Cunard S S. Co v Mellon*, 262 U S at 122 (Eighteenth Amendment); *Lam Mow v. Nagle*, 24 F 2d 316, 318 (9th Cir. 1928) (Fourteenth Amendment). *In re A—*, 3 I & N. Dec. 677, 679 (1949) (quoting *Mellon*, 262 U.S. at 100).

[21] Certain international law documents distinguish between a nation's "territory" and its "territorial seas." For example, the 1982 United Nations Convention on the Law of the Sea declares that in the zone contiguous to its territorial sea, a State may exercise the control necessary to prevent and punish infringements of its immigration and other laws "within its territory or territorial sea." *See* Third United Nations Conference on the Law of the Sea, Dec. 10, 1982, art. 33(1), 21 I L.M. 1245, 1276 ("1982 Conference")

[22] In any event, we have previously opined that there is no private right of action under Article 33 *See* Memorandum for Edwin D Williamson, Legal Adviser, Department of State. from Timothy E Flanigan, Acting Assistant Attorney General, Office of Legal Counsel, *Re· Article 33 of the Refugee Convention* at 3 (Dec. 12, 1991)

[23] The State Department takes the position that "the non-refoulement obligation of the Protocol [which is reflected in the "withholding of return" language of INA § 243(h)] applies only with respect to aliens who have 'entered' the United States in the immigration law sense. That is, the international treaty obligation only applies with respect to an alien who is physically present on the land mass of the United States and who has passed a port of entry . . . [T]he non-refoulement obligation of the Refugee Protocol does not apply at sea at all and therefore has no bearing on the questions presented to you by INS." State Department Submission, at 2

Article 33 is re-enforced by the negotiating history of the article and the interpretations of commentators.[24]

Accordingly, we conclude that the INA's sections relating to asylum and withholding do not require that an exclusion hearing be provided for aliens interdicted within territorial waters.

## C. *The Geographical Limits of the "United States"*

Our reading of the INA is consistent with the statute's definition of the "United States," 8 U.S.C. § 1101(a)(38). "[t]he term 'United States', except as otherwise specifically herein provided, when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States."

That definition makes no reference to the United States's territorial waters and on its face is consistent with the view, supported by other sections of the INA, that an undocumented alien is entitled to an exclusion hearing only if he or she has actually arrived at a port of entry.[25]

The INS takes a contrary view, arguing that the procedural protections of the INA are triggered whenever an undocumented alien arrives within United States territorial waters. INS Draft Memorandum, at 2. As INS concedes, however, *id.* at 3, its current position conflicts with an opinion of the INS General Counsel issued only four years ago.[26]

In its current submission, INS relies primarily upon *International Longshoremen's and Warehousemen's Union v. Meese*, 891 F.2d 1374 (9th Cir. 1989)

---

[24] The materials cited in *Sale*, 509 U S. at 179-87 reflecting the negotiations on Article 33, do not suggest that the signatories contemplated obligations extending beyond their land borders Rather, at least some commentators imply a contrary conclusion *See* 2 A Grahl-Madsen, *The Status of Refugees in International Law* 94 (1972) ("[Article 33] does not obligate the Contracting States to admit any person *who has not already set foot* on their respective territories" (emphasis added)), N. Robinson, *Convention Relating to the Status of Refugees Its History, Contents and Interpretation* 163 (1953) ("[I]f a refugee has succeeded in eluding the frontier guards, he is safe [under Article 33]; if he has not, it is his hard luck "). A person who has merely entered the territorial waters within three or twelve miles of a nation s coast can hardly be viewed as having "set foot" in that nation or as having "eluded" its frontier guards.

[25] In numerous other statutes, Congress has specifically included a reference to the territorial waters when defining the "United States " For example, the Longshore and Harbor Workers Compensation Act defines the term "United States" "when used in a geographical sense [to include] the several States and Territories and the District of Columbia, including the territorial waters thereof ' 33 U.S C. § 902(9) The Congressional Research Service has identified a large number of statutes referring explicitly to the territorial sea *See* Memorandum for Committee on Merchant Marine and Fisheries, from American Law Division, *Re Effect of Territorial Sea Extension on Selected Domestic Law*, CRS-12 (Mar 16, 1989), *reprinted in* 1989 Hearings, at 60.

[26] *See* INS General Counsel's Opinion 89-30, entitled "8 C F R § 274a.1(h) - 'employment' and 'touches at port': in the United States" (Mar 15, 1989). That opinion's main conclusion was that labor performed on a United States vessel within United States territorial waters, but while the vessel is not touching at a port in the United States, does not constitute "employment" in the United States within the meaning of the INA. The opinion further concluded that "[t]he term 'United States', as defined in INA § 101(a)(38), does not include its 'territorial waters '" *Id* at 4.

("*ILWU*"). There, the INS had determined that Canadian nationals who operated cranes aboard vessels operating in U.S. coastal waters were bona fide "alien crewmen" within the meaning of 8 U.S.C. § 1101(a)(15)(D), and were therefore not required to obtain labor certification from the Department of Labor under 8 U.S.C. § 1182(a)(5). In an action challenging that determination brought by an American labor union, the court of appeals held that the crane operators did not qualify as "alien crewmen" under the INA and therefore were subject to domestic labor certification requirements. The court rejected the Government's contention that the INA's labor certification requirements were inapplicable because the crane operators never "'actually enter the United States as that term is applied to the crew of vessels in U.S. waters because the crane operators never leave the vessel.'" *Id.* at 1384. In rejecting this argument, the court stated:

> An "entry," however, is not a prerequisite to the applicability of the immigration laws, those laws are triggered whenever an alien merely arrives in the United States, regardless of whether he actually effectuates an "entry." The territorial waters surrounding this country are classified as part of the United States. Thus, if persons employed aboard a foreign vessel do not fall within the definition of an alien crewman, then their arrival into U.S. territorial waters could violate provisions of the Act.

*Id.* (citations omitted).

INS's reliance on *ILWU* is misplaced. The court was not presented with any question that required it to decide whether mere arrival within territorial waters entitles an undocumented alien to an exclusion hearing. Moreover, to the extent that the court's broad language implied an answer to that question, its analysis was flawed.

First, the *ILWU* court paid no attention to the detailed requirements for any exclusion hearing that are specified by the statute. It is the specific language of the specialized provisions in the INA that determines the extent of an undocumented alien's procedural rights in pursuing the various legal methods of gaining admission into the United States. In reaching out for an unduly broad result, the court failed to analyze those provisions.

Second, the court's assertion that a vessel's mere arrival in United States territorial waters triggers the general applicability of the domestic immigration laws was unsupported by any pertinent reasoning or legal authorities. The court cited only two cases, neither of which in fact supports its conclusion. One of the cases does no more than establish that the United States has the legal capacity to assert jurisdiction and apply its penal statues within territorial waters; the other case tends, if anything, to *undercut ILWU* by demonstrating the significance of reaching a port of

entry, rather than the territorial seas, for triggering jurisdictional consequences under the INA.[27]

INS also relies on *Piledrivers' Local Union No. 2375 v. Smith,* 695 F.2d 390 (9th Cir. 1982). There the court held that the INA and its labor certification requirements apply to the outer Continental Shelf because the OCSLA extended the general legal jurisdiction of the United States to the outer Continental Shelf. *See* 43 U.S.C. §§ 1331-1356. Specifically, the operative section of OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the United States . . . to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon." *Id.* § 1333(a)(1).

While citing *Piledrivers' Local,* INS states that it "disagrees" with its holding that the INA and its labor certification requirements extend to alien workers on the outer Continental Shelf. INS adds, however, that "if the Act did apply to the outer continental shelf, *a fortiori* it would extend through the territorial sea." INS Draft Memorandum, at 3 n.2.

Our Office has previously considered the relationship between the INA and the OCSLA in *Outer Continental Shelf — Drilling Rigs — Alien Workers,* 3 Op. O.L.C. 362 (1979). Specifically, we addressed the question whether, in light of certain 1978 amendments to the OCSLA, the INA applied to drilling rigs on the outer Continental Shelf. We characterized the OCSLA, which was originally enacted in 1953, as "basically a guide to the administration and leasing of offshore mineral-producing properties." *Id.* at 362. Considering OCSLA's federal jurisdiction provision, 43 U.S.C. § 1333(a)(1), without reference to the 1978 amendments to the Act, we found that (3 Op. O.L.C. at 363-64):

> Based on a literal reading of that provision, it is certainly possible to conclude that the immigration laws should apply. The 1953 law adopts Federal law "to the same extent as if the Outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State." The immigration laws apply, of course, to Federal enclaves within States. It appears that § 1333(a)(1) was drafted so that it would include Federal laws which, read by themselves, might be

---

[27] The court cited *Cunard S.S Co v Mellon,* 262 U S at 122, and *Lazarescu v. United States,* 199 F.2d 898, 900-01 (4th Cir. 1952). *ILWU,* 891 F 2d at 1384. *Cunard* held that the Eighteenth Amendment and the National Prohibition Act implementing it applied to both foreign and domestic merchant ships within the territorial waters of the United States. 262 U S. at 124-26. *Lazarescu* involved the prosecution of a previously deported seaman for unlawful re-entry into the United States The court's discussion of the geographical factors governing application of the INA in that case does not, in fact, place controlling significance on arrival in the territorial waters. As the court observed, "[t]he port and harbor of Baltimore is territory of the United States Entry into *that* territory even in a vessel amounted to a violation of the act unless appellant was under restraint which prevented his departing from the vessel." *Id* at 900-01 (emphasis added). The court's language seems to undermine *ILWU'*s suggestion that an alien's arrival in the territorial waters (rather than at a port) triggers the INA's procedures governing exclusion.

interpreted as being limited in their application to the continental United States.

*See also id.* at 364 (citing legislative history supporting such an interpretation); Warren M. Christopher, *The Outer Continental Shelf Lands Act: Key to a New Frontier*, 6 Stan. L. Rev. 23, 38, 41-42 (1953) (to like effect).[28]

In light of our 1979 analysis, we are prepared to assume here that, except as OCSLA otherwise specifically provides, that statute extended the INA to "the sub-soil and seabed of the outer Continental Shelf," as well as to "artificial islands" and certain "installations or other devices" attached to the seabed or used for transport. *See* 43 U.S.C. § 1333(a)(1). We do not see, however, how such an extension of the INA would be relevant to the question whether undocumented aliens are entitled to an exclusion hearing if they are interdicted in the territorial waters.

First, OCSLA's very definition of the "outer Continental Shelf" shows that INS's argument is mistaken. The "outer Continental Shelf" is defined at 43 U.S.C § 1331(a) to mean "all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 1301 of this title, and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." There is an obvious distinction between the Continental Shelf's "subsoil and seabed" (and certain structures attached to the Shelf or used in exploiting its resources) and the *waters* lying above the Shelf. The extension of Federal jurisdiction to the subsoil and seabed of the Shelf would by no means require or imply its extension to the waters above it. Congress's intent in enacting OCSLA was to protect the Federal Government's "paramount rights to the *seabed* beyond the three-mile limit," and specifically its interests in "the leasing and development of the resources *of the seabed*," including oil, natural gas, and minerals. *United States v. Maine*, 420 U.S. 515, 526-27 (1975) (emphases added). Nothing in that purpose requires, or even suggests, the extension of the immigration laws to the waters lying above that seabed.

Moreover, as a matter of international law, the waters lying above the seabed and subsoil of the Continental Shelf are considered to be open sea to the extent that they are outside territorial waters. *See Oil Tanker Officer Tax Liability Case*, Bundesfinanzhof [BFHE][Supreme Tax Court] 123, 341 (F.R.G.), *translated in* 74 Int'l L. Rep. 204, 210 (E. Lauterpacht and C.J. Greenwood eds., 1987). Thus, "a

---

[28] In connection with our 1979 opinion, we note *United Ass'n of Journeymen v Thornburgh*, 768 F. Supp 375 (D D C. 1991) That case dealt with the question whether aliens, in order to perform work installing oil rigs on the outer Continental Shelf, must obtain visas of the type issued to nonimmigrant aliens entering the United States to perform temporary service or labor The district court granted summary judgment, holding that the INA applied to the outer Continental Shelf, and explicitly disagreeing with our Office's conclusion that OCSLA precluded application of the INA to the Shelf. *Id.* at 379 However, the court of appeals vacated the district court's grant of summary judgment and remanded for resolution of matters of fact *See United Ass'n of Journeymen v Barr*, 981 F.2d 1269 (D C Cir 1992), *cert denied*, 117 S Ct. 49 (1996) The court of appeals specifically declined to decide "the broad question whether the Immigration and Nationality Act generally applies on the outer Continental Shelf " *Id* at 1274.

ship operating beyond the territorial sea above the area of the continental shelf is still to be regarded as being on the high seas and not subject to the sovereignty of the coastal State." *Id.* at 211. *Sale,* of course, has settled the issue of the President's power under the INA to return, without any hearing, aliens interdicted on the high seas — including, therefore, the high seas above the outer Continental Shelf.

## D. *Effect Of Presidential Proclamation No. 5928*

As discussed above, Presidential Proclamation No. 5928 of December 27, 1988, announced that the territorial sea of the United States would extend to twelve nautical miles from the baselines of the United States. The President further stated:

Nothing in this Proclamation:

(a) extends or otherwise alters existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom;

54 Fed. Reg. at 777.

Despite this expressed intent not to alter domestic law, the INS suggests that the Proclamation did operate to extend the scope of the INA. More precisely, the INS appears to argue that the Proclamation operated to enlarge the INA's definition of the "United States," found in 8 U.S.C. § 1101(a)(38). *See* INS/OGC Memorandum, at 1-3.[29]

When the Proclamation was proposed, this Office considered various issues relating to its legality. As to the possible effect of the Proclamation on domestic law, we opined:

By its terms, the Proclamation will make clear that it is not intended to affect domestic law. Congress may, however, have enacted statutes that are intended to be linked to the extent of the United States' territorial sea under international law. The issue, therefore, in determining the effect of the proclamation on domestic law is whether Congress intended for the jurisdiction of any existing statute to include an expanded territorial sea. Thus, the question is one of legislative intent.

*Legal Issues Raised by the Proposed Presidential Proclamation to Extend the Territorial Sea,* 12 Op. O.L.C. 238, 253 (1988).

---

[29] There is no basis for assuming, as INS perhaps does, that the Proclamation's expansion of the territorial sea would uniformly affect each discrete provision or definition in the INA, without regard to its particular phrasing or function

Our 1988 opinion invites the question whether Congress intended the INA, or particular sections of the INA, to track any changes in the bounds of the United States's territorial sea. We have therefore considered whether Congress intended the INA's definition of the "United States" at 8 U.S.C. § 1101(a)(38) to track, and conform to, changes in international law determining the extent of the United States's territorial sea. We believe that Congress had no such intent. The INS has offered no evidence that Congress meant either the INA as a whole, the INA's provisions governing the treatment of aliens seeking entry in particular, or the INA's definition of the "United States," to track such changes in international law. After reviewing the legislative history, we have discovered no such evidence ourselves. Thus, we conclude that it is extremely unlikely that Congress intended the INA's definition of the "United States" to be ambulatory, and to follow changes in international law.

We shall, however, assume *arguendo* that Congress intended the INA's definition of the "United States" to track changes in the extent of the United States's territorial sea recognized by international law. *Cf. Argentine Republic*, 488 U.S. at 441 (suggesting by negative implication that if injury had occurred in territorial waters, it would have taken place within the "United States" as defined in the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1330). It still does not follow that exclusion proceedings must be provided for undocumented aliens interdicted within the twelve mile bounds that now comprise the territorial waters. An implicit enlargement of the INA's definition of the "United States" to include the new territorial waters has no bearing on the scope of the statute's exclusion provisions, INA sections 225-226. As discussed above, these sections do not refer to the "United States" in any relevant way; rather, they refer to "*the ports* of the United States," and condition exclusion proceedings on arrival at such ports. *Id.* (emphasis added). In short, by enlarging the territorial waters, the Proclamation may also have extended the geographical scope of the "United States" under the INA; but it does not follow that aliens for whom exclusion proceedings need not previously have been provided have become entitled to them.

Furthermore, the Proclamation should have no impact on the procedural entitlements of undocumented aliens under the INA because the statute's only significant reference to the territorial waters occurs in a provision establishing the Government's power to deter illegal immigration rather than in any of the provisions establishing an alien's procedural rights in seeking to enter the United States. A computer search shows that the terms "territorial waters" or "territorial sea" are mentioned in only one section of title 8 (which includes the INA).[30] That provision

---

[30] The computer search also identified a provision in the notes following 8 U S C. § 1101, referring to the "Treatment of Departures from Territorial Waters of Guam or Departures from Guam." The note states that section two of the Act of Oct 21, 1986, Pub L. No 99-505, 100 Stat 1806, had provided that "[i]n the administration of section 101(a)(15)(D)(ii) of the [INA] . an alien crewman shall be considered to have departed from Guam after leaving the territorial waters of Guam, without regard to whether the alien arrives in a foreign state before returning to Guam.'

is section 287(a)(3) of the INA, 8 U.S.C. § 1357(a)(3), discussed in detail in Part III below, which authorizes the INS to conduct warrantless searches of vessels "within the territorial waters of the United States." The absence of any other use in the INA of the terms "territorial waters" or "territorial sea" — and particularly their absence in the detailed provisions governing the treatment of aliens seeking to enter the United States — strongly suggests that an alien's arrival or presence in the territorial waters is simply not a relevant consideration for establishing or expanding the rights of aliens seeking entry. Had Congress wanted to make mere entry into the territorial waters sufficient to guarantee the entrant an exclusion hearing, it could easily have written such language into an appropriate section of the INA, as it did elsewhere in the Act. Indeed, inasmuch as the only usage of the term "territorial waters" appears in section 287's description of INS's authority to search vessels in order to *thwart* aliens attempting illegal entry, there is reason to view the territorial waters as a buffer zone, rather than as a safe harbor, in the overall scheme of the INA.

Accordingly, we conclude that Presidential Proclamation No. 5928 does not have the effect of requiring exclusion hearings to be provided to undocumented aliens interdicted within the territorial sea.

## III.

### A. *INS's Enforcement Powers Under INA Section 287*

Section 287 of the INA, 8 U.S.C. § 1357, sets forth various investigative and enforcement powers granted to INS. Of particular relevance here, INA section 287(a)(3) provides that the INS shall have power, without a warrant —

> (3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, . . . .

8 U.S.C. § 1357(a)(3).

In the wake of the Presidential Proclamation No. 5928, INS amended its interpretative regulation construing section 287. *See* 57 Fed. Reg. 47,257 (1992), codified at 8 C.F.R. § 287.1(a)(1) (1993). This interpretative rule construes the term "external boundary," as used in INA section 287(a)(3), as follows:

> (a)(1) *External boundary.* The term *external boundary*, as used in section 287(a)(3) of the Act, means the land boundaries and the territorial sea of the United States extending 12 nautical miles from the baselines of the United States determined in accordance with international law.

8 C.F.R. at § 287.1(a)(1). The regulation does not purport to construe any provi-. sion of the INA other than section 287.

The main question posed to us concerning INA section 287 is whether the INS had the authority to construe that provision so as to reflect the enlargement of the United States's territorial waters effected by the Proclamation. We believe that INS's authority to issue the regulation could be defended on either of two theories. First, the Proclamation may have operated of its own force to enlarge the scope of section 287. Second, the INS may have the authority to construe section 287 by regulation in a manner that reflects changed circumstances, including such facts as the expansion of the territorial waters by Presidential proclamation. Of these two theories, the latter appears to us the more persuasive.

We also note that the broad enforcement powers granted to the Attorney General under section 103 of the INA, 8 U.S.C. § 1103 — powers which have been delegated to the INS — could provide a separate legal basis for a regulation establishing that INS's seaward search authority extends to the limits of the twelve-mile territorial waters and even beyond. *See United States v. Chen*, 2 F.3d 330 (9th Cir. 1993), *cert. denied*, 511 U.S. 1039 (1994), discussed *infra* in Pt. III(C).

## B. *"Territorial Waters" Under INA Section 287*

As discussed in Part II above, this Office has taken the position that the question of the Proclamation's effect upon domestic law depends on a case-by-case analysis of the legislative intent behind each statute. Accordingly, we sought evidence that Congress intended the INA's definition of the "United States," 8 U.S.C. § 1101(a)(38), to track changes in international law respecting the United States's territorial waters. We discovered no such evidence. The legislative history of section 287's "territorial waters" limitation provides some guidance as to that term's origins, but we find it inconclusive on the question of whether the meaning of the term was meant to be static or dynamic.

The language of section 287 authorizing warrantless vessel searches was originally enacted as an amendment to a Justice Department appropriations bill in 1925. Appropriations for Department of State and Justice, the Judiciary, and Departments of Commerce and Labor, Pub. L. No. 68-502, 43 Stat. 1014, 1049-50 (1925). That amendment was primarily intended to provide authority for INS border patrol officials to make arrests upon sighting illegal entry of aliens, but it also provided authority for warrantless searches of vessels and other vehicles in that same context. 66 Cong. Rec. 3201-02 (1925) (statements of Sen. McKellar and Sen. Reed). The limitation of vessel searches to the territorial waters was added as a House floor amendment to the bill as reported out of the conference committee. *Id.* at 4553, 4555. The sponsor of that amendment, Mr. Connally of Texas, offered the amendment to address his concern that the absence of any limitations on the vessel

search authority was "apt to entangle our Government in difficulties with foreign nations." *Id.* at 4555. In further addressing this concern, Mr. Connally stated, "But why not limit it? It is just such loose legislation as this that produces complications with other nations." *Id.* Just before offering the amendment, Mr. Connally specifically considered using "within the 3-mile limit" as alternative language to "within territorial waters," but he opted for the latter formulation and the amendment was adopted by voice vote. *Id.* The amendment was accepted by the Senate with little discussion. *Id.* at 4519.[31]

In 1946, Congress amended the INS's search authorization statute by inserting the additional provision limiting searches to "within a reasonable distance from any external boundary of the United States." Act of Aug. 7, 1946, Pub. L. No. 79-613, 60 Stat. 865. Although there was some House debate on that bill, S. 386, 79th Cong. (1945), it did not make any reference to the term "territorial waters" or indicate that any change in the scope or effect of that term was intended. *See* 91 Cong. Rec. 5504-05, 5513 (1945). The debate did indicate that some Congressmen viewed the scope of the INS's sea search authority under the then existing territorial waters provision as quite broad. As one Member stated, "under the present law [an official] may go on any boat in *any waters* and search that boat, without a warrant, to see if there are any people there attempting to enter." *Id.* at 5505 (emphasis added).[32]

Although the legislative history of the territorial waters provision is inconclusive on the precise issue at hand, it does demonstrate that the phrase was inserted in order to avoid friction with other nations by limiting vessel searches within the three-mile territorial waters claimed by the United States in 1925. The legislative record also reveals that the author and sponsor of the territorial waters amendment considered but rejected alternative language that would have explicitly limited the vessel search authority to a "three-mile limit" — a factor that militates against the view that an immutable three-mile limit was intended. It is also apparent that the limitation ultimately imposed by Congress reflected international rather than domestic concerns. While these factors are inconclusive on the question of whether Congress intended a fixed or expandable interpretation of the territorial waters, they do suggest that the term should be interpreted with international perspective in mind. Inasmuch as the 1988 Proclamation expanded United States territorial waters in conformity with international law and practice, interpreting the term as used in section 287 to reflect that reality could be viewed as consistent with the provi-

---

[31] Senator Jones, the Floor Manager, commented on the amendment as follows before its adoption: "It seems to me that is entirely proper; I doubt if a vessel could be searched outside of territorial waters even if we did not have that language in it; so I think the Senate should concur in the amendment of the House." 66 Cong. Rec. at 4519

[32] The present language of section 287(a)(3) was enacted as part of the INA in 1952. That language, which made no significant changes to the statute as modified in 1945, was adopted by unanimous consent, without any debate or discussion as a floor amendment to the bill — H R. 5678, 82d Cong. (1952) — that became the INA 98 Cong. Rec. 4400 (1952).

sion's original design — i.e., limiting the INS's search authority to within United States's territorial waters as declared and recognized under international law.

Accordingly, there is little evidence to show that Congress intended its use of the term "territorial waters" to constitute an irrevocable commitment to the three-mile limitation in effect at the time of section 287's enactment. A reasonable interpretation of that term, taking into account the statute's evident intention to provide sufficient enforcement powers to prevent illegal immigration, would therefore incorporate the expansion of the territorial sea declared in the Presidential proclamation.

Alternatively, it can be argued that even if the Proclamation did not of its own force enlarge section 287's reference to the territorial waters, it nonetheless provided a sufficient basis for INS to promulgate its interpretative regulation. Under section 103(a) of the INA, 8 U.S.C. § 1 103(a), the Attorney General has broad authority to promulgate regulations interpreting and implementing provisions of the INA in furtherance of her duties, including the duty to protect the Nation's borders against illegal entry by unauthorized aliens.[33] The courts have accorded substantial deference to the Attorney General's regulations under the INA.[34]

INS appears to have regulatory authority to construe the terms "external boundary" and "territorial waters" in INA section 287 to refer to the twelve-mile territorial sea announced in Presidential Proclamation No. 5928, rather than to the historic three-mile territorial sea. Even if the Proclamation did not operate of its own force to alter the scope of section 287, it represented a significant change in circumstances — the international law definition of the United States's territorial waters — which INS could reasonably take into account in deciding to revise its construction of that statutory provision.

Neither the language of section 287 nor (as discussed above) the legislative history demonstrates an unambiguous congressional intent either to link the term "territorial waters" permanently to the historic three-mile boundary or to track sub-

---

[33] INA section 103(a) provides.

The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as [power is delegated to other Executive Branch officials] .       He shall establish such regulations . . as he deems necessary for carrying out his authority under the provisions of this chapter . . . . He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens   . . .

*See* 8 U S C § 1 103(a).

The INA further provides that the Attorney General's determinations and rulings "with respect to all questions of law [under the INA] shall be controlling " *Id.* Without divesting the Attorney General of any powers, privileges or duties, the Attorney General's authority under section 103(a), including the authority to promulgate regulations, has been delegated to the Commissioner of INS *See* 8 C F.R. § 2 1 (1993); 1 Gordon & Mailman, at § 3 03[1]

[34] *See, e g , Jean v. Nelson,* 727 F 2d 957, 967 (11th Cir 1984), *aff'd,* 472 U.S 846 (1985) (INA "permits wide flexibility in decision-making on the part of executive officials involved, and the courts are generally reluctant to interfere"), *Nareyi v Civiletti,* 617 F.2d 745 (D C. Cir. 1979), *cert denied,* 446 U S 957 (1980) (immigration regulations promulgated by the Attorney General under the INA will be upheld as long as they are "directly and reasonably related to the Attorney General's duties and authority under the Act' )

sequent developments in the law, including international law. Accordingly, in adopting its interpretative rule, INS has not failed to "give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Rather, because "the statute is silent or ambiguous with respect to the specific issue," the question is whether INS's construction of section 287 was "permissible." *Id.* at 843. Here, we believe, INS was engaging in rulemaking to fill a "gap" implicitly left open by Congress. In such a case, Congress has impliedly delegated the question of construction to the enforcing agency. *Id.* at 843-44. The INS's interpretation should therefore be upheld so long as it is "a reasonable one." *Id.* at 845. We think that the interpretation *was* reasonable.

First, the INS's interpretation ensures that section 287 will be understood in a manner that is consistent with the current international law understanding of the United States's "territorial waters," as declared by the Proclamation. As discussed above, the territorial waters limitation was originally inserted in section 287 in order to promote just such clarity of understanding with other nations as to the scope of United States search authority at sea.

Moreover, the special problems of maritime enforcement of the law appear to support the extension of the INS's authority to board and search vessels beyond the three-mile limit. Such problems have been recognized in the context of customs enforcement, but they apply to immigration enforcement with equal force. Thus, in *United States v. Tilton*, 534 F.2d 1363, 1365 (9th Cir. 1976), the court observed that "it is not practical to set up checkpoints at the outer perimeters of the territorial waters. Nor is it likely that incoming vessels will pick up or discharge passengers or cargo between their points of entry into territorial waters and their anchorages at United States ports." Accordingly, the courts have upheld warrantless customs searches of vessels beyond the three-mile limit but within "customs waters" as valid border searches under the Fourth Amendment.[35] *See id.* (holding that a customs search of a vessel within customs waters can be valid as a border search); *United States v. Victoria-Peguero*, 920 F.2d 77, 80-81 & n.3 (1st Cir. 1990) (pointing out that customs officers are statutorily authorized to search vessels within customs waters, and noting suggestions that the contiguous zone, i.e., the waters lying between three and twelve nautical miles off the coast, be considered the functional equivalent of the border for purposes of the Fourth Amendment); *cert. denied*, 500 U.S. 932 (1991); *United States v. Hidalgo-Gato*, 703 F.2d 1267, 1273 (11th Cir. 1983) (holding the contiguous zone to be the functional equivalent of the border); *United States v. MacPherson*, 664 F.2d 69, 72 & n.2 (5th Cir. 1981) (similar to *Victoria-Peguero*); Note, *High On The Seas: Drug Smuggling,*

---

[35] "[T]he laws of the United States have since 1790 prohibited various acts within 12 miles, or 4 leagues, of the shore, as a means to enforce compliance with the customs laws." William W. Bishop, *International Law. Cases and Materials* 622-23 (3d ed. 1971). The offshore waters reaching to the twelve-mile limit in which such enforcement was authorized were known as the "customs waters." *See* 19 U.S.C. § 1401(j).

*The Fourth Amendment, And Warrantless Searches At Sea*, 93 Harv. L. Rev. 725, 733-34 (1980) (detailing difficulties in law enforcement at sea near borders, and arguing for "functional" understanding of borders that could extend them beyond three-mile limit). Analogously, the special difficulties in policing the seaward boundaries can justify INS's regulatory extension of its search authority up to the twelve-mile limit.[36]

Finally, it is no objection to INS's regulation that it might be said to represent a departure from the agency's prior position. An agency's position is "not instantly carved in stone," and "the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863-64; *see also Rust v. Sullivan*, 500 U.S. 173, 186 (1991).[37]

## C. *INA Section 103 Authority and "United States v. Chen"*

Although we have been specifically asked to examine the validity of the INS interpretive regulation expanding its authority to conduct warrantless searches in the territorial waters under section 287 of the INA, it should be pointed out that the broad enforcement powers granted the Attorney General under section 103 of the INA could provide the legal basis for a substantive regulation authorizing an equal or even greater range for INS search authority at sea. Section 287 authorizes and limits INS's direct authority to conduct searches at sea, but its territorial limitations do not apply to the Attorney General's broader enforcement powers (which are delegable to INS) under the INA. The recent opinion in *United States v. Chen*, 2 F.3d 330 (9th Cir. 1993) provides strong support for this position.

In *Chen*, the court unanimously held that section 103 of the INA provided INS with adequate statutory authority (under delegation from the Attorney General) to conduct an undercover "sting" operation some *three hundred and twenty miles* off the coast of the United States to thwart the smuggling of illegal aliens from China.

---

[36] We also believe that INS officials would have authority to make arrests under the provisions of INA section 287(a)(2) within the twelve-mile territorial sea recognized in the INS regulation Section 287(a)(2) authorizes INS officials, without warrant, "to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of [the immigration laws regulating admission, exclusion, or expulsion of aliens] " Although undocumented aliens detected in the twelve-mile territorial waters before reaching a port might not yet be "entering" the United States, there will be circumstances where an INS official's observations provide reasonable grounds to believe that aliens are "attempting to enter" in violation of the immigration laws, thereby providing the basis for arrest under section 287(a)(2).

[37] We also can discern no international law objection to the INS regulation *See* 1982 Conference, at 1276 (allowing regulation within contiguous zone for purpose of enforcing immigration law), U.N Conference on the Law of the Sea, Convention on the Territorial Sea and the Contiguous Zone, *opened for signature* Apr 29, 1958, art 24, 15 U S T 1606, 1612, 516 U N T.S 205, 220 (entered into force Sept. 10, 1964) (same), *see also Church v Hubbart*, 6 U S (2 Cranch) 187, 234-35 (1804); *United States v Bengochea*, 279 F. 537, 539-41 (5th Cir 1922) In *Molvan v Attorney General*, [1948] App Cas 351 (P.C 1964), the Privy Council implied that international law was not violated by a British destroyer's seizing a vessel on the high seas and forcing it to port when the seized vessel was carrying several hundred undocumented aliens who intended to land illegally

The operation upheld in the *Chen* opinion included the apprehension of approximately 132 aliens, who were transferred to a vessel operated clandestinely by INS agents for transport to custody in the United States. The court specifically held that the territorial limitations on warrantless INS searches set forth in section 287(a)(3) did not offset or contradict INS's authority to conduct such an extraterritorial enforcement operation when exercising the enforcement powers delegated to it by the Attorney General. *Id.* at 334.

The court pointed out that section 274 of the INA, 8 U.S.C. § 1324, prohibiting the smuggling of illegal aliens into the United States, was intended to have extraterritorial application. It then stressed that "Congress intended to grant the Attorney General the corresponding power to enforce the immigration laws both within and without the borders of the United States." *Chen*, 2 F.3d at 333. Noting that the Attorney General has delegated these broad enforcement powers to the INS, the court reasoned that INS has "the power to take such acts as are deemed necessary for the enforcement of the immigration laws, including extraterritorial enforcement." *Id.* at 334. In rejecting the defendants' argument that section 287(a)(3)'s territorial limitations on INS warrantless search authority also circumscribed its power to conduct enforcement operations in international waters (i.e., on the high seas), the court stated, "because the Attorney General may delegate her authority, the list of powers granted [to INS] in section 1357(a) cannot be read as exhaustive." *Id.*

Thus, the *Chen* decision demonstrates that INS may draw upon the broad section 103 authority delegated to it by the Attorney General to conduct undercover investigations and seizures of undocumented aliens in international waters extending far beyond the territorial waters of the United States. That same authority would appear to provide ample basis — apart from the authority granted directly to INS by section 287 — for a substantive regulation authorizing INS to conduct warrantless searches of vessels transporting illegal aliens within the limits of the twelve-mile territorial waters and beyond.[38]

## D. *The INS Regulation*

Although we conclude that INS had authority to promulgate a regulation interpreting the section 287 search authority to encompass the twelve-mile territorial sea, the language of the regulation adopted is susceptible to ambiguous and uncertain application when read in relation to the statute. We recommend that if the policy decision to retain the regulation is made, INS should redraft it to dispel this

---

[38] We note that the INS regulation at issue here was intended to be only an "interpretative" regulation that construed section 287, not a substantive regulation deriving from the authority ascribed to the Attorney General by *Chen* A substantive regulation issued pursuant to the Attorney General's broad section 103 authority to enforce the immigration laws would not be limited by the particularized restrictions of section 287, which were specifically designed to place limits on the warrantless search authority of the INS's Border Patrol

ambiguity or, if it concludes that curative legislation is necessary, submit such a proposal to Congress.

Section 287 limits INS authority for warrantless searches at sea to vessels found "within the territorial waters," but then superimposes the additional limitation that such searches (along with INS searches of vehicles on land) must be confined "within a reasonable distance from any external boundary of the United States." As outlined in Part III(B) above, these two limitations — which on their face are difficult to reconcile — were inserted in the statute at different times and for different purposes. The territorial waters limitation was added as an amendment to the original 1925 enactment to provide a *seaward* limitation upon searches of vessels at sea. In contrast, the "reasonable distance" limitation was added to the statute in 1946 for the apparent purpose of allowing INS officials to stop and search "vehicles" within a reasonable distance *inland* from the external boundaries of the United States.

Despite the different functions and origins of section 287's two limiting phrases, the INS regulation attempts to combine them in its definition of the "external boundary" of the United States. *See* 8 C.F.R. § 287.1(a)(1). It provides that, for purposes of section 287, the external boundary means both the land boundary *and* the twelve-mile territorial sea. It then provides that the "reasonable distance" limitation (100 air miles) is to be measured from the external boundary thus defined — i.e., it can be measured either from the land boundary or from the outer limit of the territorial waters. *Id.* § 287.1(a)(2).

Because section 287 expressly limits INS's vessel-search authority to the territorial waters, the question arises whether the separate "reasonable distance from any external boundary" limitation has any relevance to searches of vessels at sea. Whether the statute's reference to territorial waters is equated with the pre-1988 three-mile zone or the expanded twelve-mile zone, it seems clear that any search within either of those zones would also be well within "a reasonable distance from any external boundary." In that regard, the courts have upheld distances of up to one hundred (land) miles from that boundary as constituting a reasonable distance within the meaning of section 287. *See Fernandez v. United States*, 321 F.2d 283, 286 (9th Cir. 1963). It therefore seems that section 287's "reasonable distance" provision does not impose any additional *limitation* upon the INS's authority to search any vessel found *within the territorial waters*. Nor does the "reasonable distance" provision serve to *expand* the area of permissible INA searches of vessels at sea. Since vessel searches are confined to vessels within the territorial waters by the specific terms of section 287, the "reasonable distance" provision cannot operate to override that specific limitation.

These considerations support the view that the reasonable distance limitation has no meaningful application to INS searches at sea. INS points out, however, that the reasonable distance limitation may have conceivable application to searches of vessels on the *inland waters*. As the INS Draft Memorandum states (at 6-7):

Although there appears to be surface tension between the require-
ment that the enforcement powers be exercised within the territorial
waters and the provision that it may be exercised within 100 miles
of any external boundary, this tension is resolved if the "reasonable
distance" provisions are read to limit the distance *inland* from any
external boundary within which Service officers may board and
search vessels or carry out their other enforcement powers under
section 287(a)(3) of the INA. Read together, § 287(a)(3) of the
INA and 8 C.F.R. §§ 287.1(a)(1)-(2) provide that the Service may,
without a warrant, board and search vessels beginning twelve miles
seaward from the coast line and extending 100 air miles inland.

However, this interpretation of section 287 also generates complications. If INS
may search vessels found on waters located 100 miles inland of *"any* external
boundary of the United States," *see* 8 C.F.R. § 287.1(a)(2) (emphasis added), there
appears to be no need to deviate from use of the *land boundary* alone as the base-
line for such purposes. Using the outer limit of the territorial sea as the baseline
for fixing the *inland* scope of the section 287 authority — an interpretation sug-
gested by INS's current submission (INS Draft Memorandum at 7, quoted above)
and its past practice[39] — would appear to *reduce* the scope of inland search
authority that would otherwise be allowed by reference to the land boundary as the
baseline.

The INS regulation would be clarified by explicitly recognizing that searches
at sea are limited only by the scope of United States territorial waters, and that in-
land searches (including searches on inland waters) are separately governed by the
reasonable distance inland measured from the land boundary. This would entail
providing separate definitions for the "external boundary" and the "territorial wa-
ters," and linking the reasonable distance limitation solely to the "external [land]
boundary."

### IV. *Conclusion*

Undocumented aliens interdicted within the twelve-mile zone that now com-
prises the territorial sea of the United States are not entitled to a hearing under the
exclusion provisions of the INA, and may be turned back from the United States by
the Coast Guard if the President so orders.

---

[39] INS applied the reasonable distance limitation in this fashion as long ago as 1952. *See* Memorandum
for the INS Commissioner, from the General Counsel, *Re. Meaning of "external boundary" of the United
States in Act of February 27, 1925, as amended, 8 U.S.C. 110, with relation to coastlines: Texas gulf coast*
(July 7, 1952) There, INS took the position that the "external boundary" baseline from which a reasonable
distance inland should be measured for search purposes was the outer limit of the three-mile territorial waters
off the eastern shore of Padre Island, Texas, a narrow strip of land ten miles from the coast line which en-
closed an arm of the Gulf of Mexico.

The INS had the authority to promulgate an interpretative rule construing the "territorial waters" of the United States, as referred to in INA section 287, to extend for twelve nautical miles, and not merely three nautical miles.

WALTER DELLINGER
*Acting Assistant Attorney General*
*Office of Legal Counsel*